[No. H034211. Sixth Dist. June 11, 2010.]

S.B.C.C., INC., Plaintiff and Appellant, v.
ST. PAUL FIRE & MARINE INSURANCE COMPANY, Defendant and
Appellant.

**COUNSEL**

Willoughby, Stuart & Bening, Randall E. Willoughby and Ellyn E. Nesbit for Plaintiff and Appellant.

Lewis Brisbois Bisgaard & Smith, Lane J. Ashley and Kathleen E. Hegen for Defendant and Appellant.

**OPINION**

**ELIA, J.**—In this action for insurance bad faith, plaintiff S.B.C.C., Inc., doing business as South Bay Construction Company (South Bay), alleged that its insurer, defendant St. Paul Fire & Marine Insurance Company (St. Paul),

had wrongfully refused to defend South Bay in an action brought by its competitor, San Jose Construction, Inc. (SJC). The superior court found no duty to defend because an exclusion in South Bay's liability policy eliminated any potential coverage for advertising injury, and the harm to SJC was not "personal injury" within the meaning of the policy language. The court accordingly denied South Bay's motion for summary adjudication and granted summary judgment to St. Paul. We conclude that the allegations of SJC's complaint did not trigger a duty to defend South Bay under the contract terms. We therefore must affirm the judgment.

## Background

St. Paul insured South Bay under a "Contractors Commercial General Liability Protection" (CGL) policy which was effective between June 4, 2003, and June 4, 2004. It covered both the company and its employees if they were engaged in work within the scope of their employment or performing duties related to the conduct of the business. One of these employees was Richard Foust, who began his employment with South Bay in late March of 2004. Foust's previous employer was SJC, where he was a project manager.

SJC filed the underlying action against both Foust and South Bay on April 2, 2004. In its first amended complaint SJC asserted 11 causes of action related to the allegation that Foust had taken valuable confidential information about SJC's existing customers, including details about ongoing "design build" contracts, and that he had used the information to solicit those customers for the benefit of South Bay, SJC's competitor.[1] The claims against South Bay were for misappropriation of trade secrets, intentional interference with prospective economic advantage, common law unfair competition, violation of Business and Professions Code section 17200 et seq. (the unfair competition law), and interference with contract.

South Bay tendered the defense to St. Paul on August 30, 2005, but St. Paul denied coverage. A lengthy exchange followed, but St. Paul refused to accept the defense, maintaining that coverage did not exist because (a) SJC was not alleging personal injury, advertising injury, property damage, or bodily injury within the meaning of South Bay's liability policy, and (b) the policy excluded claims related to breach of contract or infringement of intellectual property. Upon SJC's amendment of its complaint, South Bay again tendered the defense to St. Paul, but again to no avail.

In the course of the SJC litigation South Bay moved for summary judgment, which the trial court granted. On appeal from the January 3, 2007

---

[1] The events giving rise to the SJC action are summarized in our prior opinion in *San Jose Construction, Inc. v. S.B.C.C., Inc.* (2007) 155 Cal.App.4th 1528 [67 Cal.Rptr.3d 54].

judgment, SJC challenged the ruling as to all of the claims against South Bay except interference with contract. This court reversed, finding triable issues of fact on all four of the remaining causes of action against South Bay. (See *San Jose Construction, Inc. v. S.B.C.C., Inc., supra*, 155 Cal.App.4th at pp. 1538–1546.)

On April 14, 2008, South Bay brought the present action against St. Paul for breach of contract, breach of the covenant of good faith and fair dealing, and declaratory relief. In the first cause of action South Bay alleged that St. Paul had "breached its contractual obligations by refusing to defend [South Bay], by failing to take reasonable steps to settle the Underlying Action against [South Bay], and by continuing to deny its obligations under its policies." The second cause of action contained allegations of bad faith for denying coverage "without proper cause," for failing to investigate the underlying allegations thoroughly to determine whether they were covered, and for failing to work toward a settlement of the underlying action.

Both parties moved for summary judgment or summary adjudication of the issue of St. Paul's duty to defend.[2] The cross-motions focused on the question of whether there was potential coverage under either the "advertising injury" provision or the "personal injury" provision. After considering the parties' written and oral arguments, the trial court determined that St. Paul was entitled to judgment. The court found no potential coverage under the "personal injury" provisions of the policy. It found a triable issue of fact as to the claim that SJC had alleged "advertising injury," but there was nonetheless no coverage because the policy excluded underlying claims resulting from intellectual property infringement. The court accordingly granted St. Paul's motion, denied South Bay's, and entered judgment for St. Paul. Both parties filed timely appeals.

*Discussion*

1. *Principles of Review*

"The purpose of the law of summary judgment is to provide courts with a mechanism to cut through the parties' pleadings in order to determine whether, despite their allegations, trial is in fact necessary to resolve their dispute." (*Aguilar v. Atlantic Richfield Co.* (2001) 25 Cal.4th 826, 843 [107 Cal.Rptr.2d 841, 24 P.3d 493] (*Aguilar*).) Summary judgment is appropriate "if all the papers submitted show that there is no triable issue as to any material fact and that the moving party is entitled to a judgment as a matter

---

[2] St. Paul moved for summary judgment or, alternatively, summary adjudication; South Bay moved for summary adjudication only.

of law." (Code Civ. Proc., § 437c, subd. (c).) A defendant who moves for summary judgment or summary adjudication bears the initial burden to show that the action or cause of action has no merit—that is, "that one or more elements of the cause of action, even if not separately pleaded, cannot be established, or that there is a complete defense to that cause of action." (Code Civ. Proc., § 437c, subds. (a), (p)(2).) When the burden of proof at trial will be on the plaintiff by a preponderance of the evidence, the moving defendant "must present evidence that would preclude a reasonable trier of fact from finding that it was more likely than not that the material fact was true [citation], or the defendant must establish that an element of the claim cannot be established, by presenting evidence that the plaintiff 'does not possess and cannot reasonably obtain, needed evidence' " to support a necessary element of the cause of action. (*Kahn v. East Side Union High School Dist.* (2003) 31 Cal.4th 990, 1003 [4 Cal.Rptr.3d 103, 75 P.3d 30], quoting *Aguilar, supra,* 25 Cal.4th at p. 854; *Guz v. Bechtel National, Inc.* (2000) 24 Cal.4th 317, 334 [100 Cal.Rptr.2d 352, 8 P.3d 1089].) And where the plaintiff has also moved for summary judgment—or, as in this case, summary adjudication—that party has the burden of showing there is no defense to a cause of action. (Code Civ. Proc., § 437c, subd. (a).) That burden can be met if the plaintiff "has proved each element of the cause of action entitling the party to judgment on that cause of action." (Code Civ. Proc., § 437c, subd. (p)(1).) If the plaintiff meets this burden, it is up to the defendant "to show that a triable issue of one or more material facts exists as to that cause of action or a defense thereto." (Code Civ. Proc., § 437c, subd. (p)(1).) "We need not defer to the trial court and are not bound by the reasons for the summary judgment ruling; we review the ruling of the trial court, not its rationale." (*Knapp v. Doherty* (2004) 123 Cal.App.4th 76, 85 [20 Cal.Rptr.3d 1].)

The central issue between the parties was whether the liability policy potentially covered SJC's lawsuit, thereby giving rise to St. Paul's duty to defend South Bay in the action. As this is a question requiring interpretation of the policy provisions, it is determined independently by the reviewing court. (*Powerine Oil Co., Inc. v. Superior Court* (2005) 37 Cal.4th 377, 390 [33 Cal.Rptr.3d 562, 118 P.3d 589]; cf. *MacKinnon v. Truck Ins. Exchange* (2003) 31 Cal.4th 635, 641 [3 Cal.Rptr.3d 228, 73 P.3d 1205].)

■  Established rules assist in that interpretation. Whether an insurer has a duty to defend "depends, in the first instance, on a comparison between the allegations of the complaint and the terms of the policy. [¶] . . . [¶] . . . If any facts stated or fairly inferable in the complaint, or otherwise known or discovered by the insurer, suggest a claim potentially covered by the policy, the insurer's duty to defend arises and is not extinguished until the insurer negates all facts suggesting potential coverage. On the other hand, if, as a matter of law, neither the complaint nor the known extrinsic facts indicate any basis for potential coverage, the duty to defend does not arise in the first

instance." (*Scottsdale Ins. Co. v. MV Transportation* (2005) 36 Cal.4th 643, 654–655 [31 Cal.Rptr.3d 147, 115 P.3d 460].)

■ "While insurance contracts have special features, they are still contracts to which the ordinary rules of contractual interpretation apply. [Citation.] The fundamental goal of contractual interpretation is to give effect to the mutual intention of the parties. (Civ. Code, § 1636.) If contractual language is clear and explicit, it governs. (Civ. Code, § 1638.) On the other hand, '[i]f the terms of a promise are in any respect ambiguous or uncertain, it must be interpreted in the sense in which the promisor believed, at the time of making it, that the promisee understood it.' [Citations.] This rule, as applied to a promise of coverage in an insurance policy, protects not the subjective beliefs of the insurer but, rather, 'the objectively reasonable expectations of the insured.' [Citation.] Only if this rule does not resolve the ambiguity do we then resolve it against the insurer." (*Bank of the West v. Superior Court* (1992) 2 Cal.4th 1254, 1264–1265 [10 Cal.Rptr.2d 538, 833 P.2d 545] (*Bank of the West*), quoting *AIU Ins. Co. v. Superior Court* (1990) 51 Cal.3d 807, 822 [274 Cal.Rptr. 820, 799 P.2d 1253].)

Policy terms will be considered ambiguous if they are "capable of two or more constructions, both of which are reasonable. [Citation.] But language in a contract must be interpreted as a whole, and in the circumstances of the case, and cannot be found to be ambiguous in the abstract. (*Bank of the West, supra*, 2 Cal.4th at p. 1265.) Courts will not strain to create an ambiguity where none exists." (*Waller v. Truck Ins. Exchange, Inc.* (1995) 11 Cal.4th 1, 18–19 [44 Cal.Rptr.2d 370, 900 P.2d 619]; see also *TRB Investments, Inc. v. Fireman's Fund Ins. Co.* (2006) 40 Cal.4th 19, 27–28 [50 Cal.Rptr.3d 597, 145 P.3d 472].)

### 2. *Comparison of the Policy Terms and the Underlying Complaint*

The disputed policy provisions pertain to "Advertising Injury Liability" and "Personal Injury Liability," the grounds of South Bay's complaint and summary adjudication motion. The coverage provision of the first ground states: "**Advertising injury liability**. We'll pay amounts any protected person is legally required to pay as damages for covered advertising injury that:

"• results from the advertising of your products, your work, or your completed work; and

"• is caused by an advertising injury offense committed while this agreement is in effect."

"Advertising injury" is defined as "injury, other than bodily injury or personal injury, that's caused by an advertising injury offense." "Advertising

injury offense" is defined to include defamation, disparagement of another's work or business, disclosure of "covered material that violates a person's right of privacy," and the circumstance invoked by South Bay—that is, "[u]nauthorized use of any advertising idea or advertising material, or any slogan or title, of others in your advertising."

The term "advertising" is itself defined in the policy: "*Advertising* means attracting the attention of others by any means for the purpose of:

"• seeking customers or supporters; or

"• increasing sales or business."

An "advertising idea" is "a manner or style of advertising that others use and intend to attract attention in their advertising. [¶] But we won't consider information used to identify or record customers or supporters, such as a list of customers or supporters, to be an advertising idea." Finally, "advertising material" is "any covered material that

"• is subject to copyright law; and

"• others use and intend to attract attention in their advertising."

The promise to pay damages for "personal injury liability" is contained in the following statement: "**Personal injury liability.** We'll pay amounts any protected person is legally required to pay as damages for covered personal injury that: [¶] results from your business activities; and [¶] is caused by a personal injury offense committed while this agreement is in effect." The term "[*p*]*ersonal injury* means injury, other than bodily injury or advertising injury, that's caused by a personal injury offense." A "personal injury offense" consists in any of a number of listed wrongful acts, including "[m]aking known to any person or organization covered material that violates a person's right of privacy."[3] Finally, "covered material means any material in any form of expression, including material made known in or with any electronic means of communication, such as the Internet," but excluding such material as the content of the protected person's online chat room or bulletin board or a Web site designed by a protected person whose business is designing or maintaining Web sites for others.

The other controversial provision was an exclusion for suits involving intellectual property. The policy stated: "We won't cover injury or damage or

---

[3] The term "covered material" refers to (with exceptions related to the protected person's Web site design business or hosted electronic bulletin board) "any material in any form of expression, including material made known in or with any electronic means of communication, such as the Internet."

medical expenses that result from any actual or alleged infringement or violation of any of the following rights or laws:

"• Copyright

"• Patent.

"• Trade dress.

"• Trade name.

"• Trade secret.

"• Trademark.

"• Other intellectual property rights or laws.

"Nor will we cover any other injury or damage that's alleged in any claim or suit which also alleges any such infringement or violation. [¶] But we won't apply this exclusion to bodily injury or property damage that results from your products or your completed work. [¶] Nor will we apply this exclusion to advertising injury that results from the unauthorized use of any:

"• copyrighted advertising material;

"• trademarked slogan; or

"• trademarked title;

"of others in your advertising."

a. *Advertising Injury*

In its motion for summary judgment St. Paul argued that SJC's confidential customer information could not reasonably be considered advertising material or an advertising idea; hence, there could have been no advertising injury offense. St. Paul further asserted that South Bay would not be able to show causation between the solicitation and the injury, because it was the misappropriation that caused the alleged damage to SJC. In opposition to St. Paul's summary judgment motion and in its own summary adjudication motion, South Bay contended that its conduct amounted to "advertising" and "advertising injury" because it was accused of having used the confidential information obtained from Foust to solicit SJC's customers. The trial court agreed with South Bay that triable issues of fact existed on the questions of

(1) whether South Bay's solicitations constituted advertising, (2) whether the allegedly misappropriated information constituted "advertising ideas," and (3) "whether the use of the information . . . potentially caused SJC damage." Nevertheless, because it also found applicable the exclusion for intellectual property claims, the court granted summary judgment to St. Paul.

On appeal, the parties describe the efforts of numerous courts that have analyzed policy coverage of advertising injury. Even though several of these decisions arose in the same context—that is, misappropriation and use of the plaintiff's confidential customer information to solicit the plaintiff's customers—the policy terms relating to advertising injury are not identical. In *Hameid v. National Fire Insurance of Hartford* (2003) 31 Cal.4th 16 [1 Cal.Rptr.3d 401, 71 P.3d 761], for example, the policy did not define advertising, but defined "advertising injury" to include " '[m]isappropriation of advertising ideas or style of doing business.' " (*Id.* at p. 22.) Confronting the term "advertising" itself, the Supreme Court adopted the interpretation relied on by the majority of courts in other jurisdictions—that is, "widespread promotional activities usually directed to the public at large." (*Id.* at p. 24; see also *Bank of the West, supra,* 2 Cal.4th at p. 1276, fn. 9 [recognizing majority definition].) This definition comported with the commonly understood sense of the word "advertising." It precluded personal solicitations of individual customers, the basis of the underlying plaintiff's lawsuit.

The court in *We Do Graphics v. Mercury Casualty Co.* (2004) 124 Cal.App.4th 131 [21 Cal.Rptr.3d 9] did not identify any definition of advertising in the policy, but only explained why "advertising injury" as defined in the policy did not include the alleged use of stolen customer information to solicit a former employer's customers. The court further held that the stolen customer information did not constitute advertising ideas, though again it did not define that term. And in *Peerless Lighting Corp. v. American Motorists Ins. Co.* (2000) 82 Cal.App.4th 995 [98 Cal.Rptr.2d 753], the policy did not define "advertising"; consequently, the appellate court used the majority definition and held that advertising did not include soliciting a single customer with a tailormade product in the course of a competitive bidding process. (*Id.* at p. 1012.) Likewise, the policy considered in *Sentex Systems, Inc. v. Hartford Accident & Indemnity Co.* (9th Cir. 1996) 93 F.3d 578 defined neither "advertising" nor "advertising idea." The Ninth Circuit did "not necessarily agree" with the district court's broad interpretation of these concepts to permit coverage for allegations of misappropriating a customer list, but it nonetheless held that there was potential coverage given the broader scope of the underlying action, which included misappropriation of marketing techniques. (*Id.* at pp. 580, 581; see also *Sentex Systems, Inc. v. Hartford Accident & Indemnity Co.* (C.D.Cal. 1995) 882 F.Supp. 930.)

The liability policy in *Rombe Corp. v. Allied Ins. Co.* (2005) 128 Cal.App.4th 482 [27 Cal.Rptr.3d 99] did contain a definition of "advertisement": " '(a notice that is broadcast or published to the general public or specific market segments about your goods, products or services for the purpose of attracting customers or supporters.' " (*Id.* at p. 485.) There a franchisee of TRC, an employment agency, hosted a breakfast meeting at which its customers and employees were invited to associate themselves with a new employment agency that would replace TRC. Overturning the lower court's summary judgment, the appellate court agreed with the insurer that neither the meeting nor a subsequent Internet report of the meeting involved the use of TRC's advertising ideas. (*Id.* at p. 489.) The meeting itself was not an advertisement; and even if the press report was, it did not involve a covered advertising offense. Even using the words "specific market segments" did not expand the definition of "advertising" to include personal solicitations. Rombe's broad interpretation of "specific market segments" "could easily include the one-on-one solicitations which the court in *Hameid* found outside the scope of advertising." (*Id.* at p. 492.) It also would lead to findings of coverage "for almost all commercial disputes between competitors," and it would promote a case-by-case approach that the *Hameid* court rejected as encouraging litigation and undermining standardization of policy language. (*Ibid.*; see *Hameid v. National Five Insurance of Hartford, supra,* 31 Cal.4th at p. 29 [emphasizing importance of standard policy terms].)

█ Here, as South Bay points out, the CGL policy is unusual in that it expressly defines "advertising" as well as "advertising injury" and "advertising idea." South Bay contends that the policy definition of "advertising" is expansive enough to include personal solicitations of a competitor's customers. We disagree. The provision, though certainly broader than the majority definition adopted in *Hameid,* nonetheless requires the insured to have been "attracting the attention of others" with a purpose of "seeking customers or supporters" or "increasing sales or business." Here Foust, the primary culprit in the alleged misconduct, had no need to "attract the attention" of the customers he was soliciting; they were already doing business with him, and he merely sought to transfer their association from SJC to South Bay. A conclusion that this activity constituted advertising would be unreasonable and beyond the likely intent of the contracting parties.

An "advertising injury offense," aside from inapplicable torts,[4] entails the unauthorized use by the insured of either an "advertising idea" or "advertising material" of another. Even if South Bay was engaged in advertising when it personally solicited SJC's customers and subcontractors, it did not use SJC's "advertising material"—which is material that is *both* "subject to

---

[4] The SJC complaint did not allege libel or slander, business-related disparagement, or disclosure of material in violation of a person's right of privacy.

copyright law" and used by others "to attract attention in their advertising." There is nothing in the record to suggest either that SJC's customer information and project details were subject to copyright law or that they were being used by SJC in advertising. At the time Foust took these materials to South Bay, SJC was engaged in preparations for five construction projects with *established* clients and subcontractors.

Likewise, we cannot reasonably conclude that South Bay used SJC's "advertising idea" when it participated in Foust's recruitment of project owners and subcontractors. First, no "[u]nauthorized use of any advertising idea" is implicated when the advertising idea consists in "information used to identify or record customers or supporters, such as a list of customers or supporters." SJC alleged that Foust had brought to South Bay a list of names and telephone numbers for several hundred subcontractors whom SJC had used over the years, along with a list of "preferred vendors" and client information. Clearly these names and numbers were not "advertising ideas" within the meaning of the policy, in light of the exclusion for "information used to identify or record customers or supporters, such as a list of customers or supporters."

Furthermore, there are no facts suggesting that the misappropriated information was used "to attract attention" in SJC's advertising. Foust had developed project details with numerous subcontractors who had already submitted bids on pending SJC projects; some projects were "ready to go," and at least one other was delayed but was viewed with some urgency by the project owner. (See *San Jose Construction, Inc. v. S.B.C.C., Inc., supra*, 155 Cal.App.4th at p. 1531.) During the last two weeks of his employment at SJC, Foust took project information contained in more than 200 documents related to five prospective jobs on which SJC had bid. The documents included project budgets and proposals made to the owners, correspondence between owner and architect, all subcontractor bids, cost estimates, requests for information by subcontractors or project managers, and responses to those requests from the owner or architect. This information, which Foust uploaded onto South Bay's computer system, gave Foust "everything he needed to begin work right away on at least three projects for South Bay." (*Ibid.*) On his first day of work at South Bay, Foust invited subcontractors to a meeting at which he persuaded all but two to move with him to South Bay. South Bay's project proposals submitted soon thereafter were "in large part the same" as those produced by SJC the previous month. (*Id.* at p. 1533.) South Bay was alleged to have cooperated in Foust's efforts to transfer client patronage and subcontractor loyalty from SJC to South Bay.

None of this information can reasonably be said to constitute advertising by SJC. All of the project details, together with the list of contacts, represent

established relationships which SJC, through Foust, had developed with customers and subcontractors. By personally soliciting them to move with him to South Bay, Foust was not using either SJC's advertising ideas or its advertising material. Putting the South Bay logo on SJC's project proposals does not transform South Bay's activity into advertising. We therefore agree with St. Paul that the conduct giving rise to SJC's lawsuit cannot reasonably be deemed an "advertising injury offense" and thus did not present a potential for coverage under that provision of the CGL policy issued to South Bay.

### b. *Personal Injury*

South Bay maintains that it was entitled to coverage for a "personal injury offense" because Foust took SJC's confidential information and delivered it to South Bay, thereby "[m]aking known to any person or organization covered material that violates a person's right of privacy." The parties debate the effect of the reference to "a person's right of privacy." South Bay concedes that the policy does not define "person" to refer to organizations; instead, it indirectly tries to append such a reference to several provisions that expressly include organizations in defining *other* terms. For example, "[p]ersonal injury and advertising injury each person limit" limits indemnity for personal injury and advertising injury that "is sustained by any one person or organization." "Personal injury each person deductible" addresses the deductible for personal injury "sustained by any one person or organization." The deductible for advertising injury similarly refers to the deductible for advertising injury "sustained by any one person or organization." The term "protected person" also "means any person or organization," qualifying under the "Who is Protected" provision of the agreement—that is, the named insured as well as specified individuals *and* organizations.

But the wording of these selected policy provisions does not support South Bay's position; if anything, it weakens it. That certain terms specifically *include* organizations does not imply that organizations *are* persons when reference is made only to a person. On the contrary, the policy carefully identifies organizations when it intends to refer to them.[5] Nothing in the definition of "personal injury offense" suggests that a "*person's*" right of privacy was intended to encompass an organization's right as well. If the parties had wanted to include organizations in the scope of this provision, it would have added "or organization's" to "a person's" in referring to the right of privacy, as it did in explaining personal injury limits, deductibles, and the categories of "protected persons." Indeed, the "right of privacy" provision itself draws the intended distinction by defining "personal injury offense" to

---

[5] For example, in delineating "Who is Protected Under This Agreement," the policy defines each of various kinds of workers as "any person who," whereas an "[e]mployee leasing firm" can be "any person or organization . . . ."

include "[m]aking known to any person *or organization* covered material," while denoting the victim of that disclosure as only a person. Thus, even if South Bay is correct in asserting that corporations have a right of privacy,[6] that right was not implicated for purposes of determining the scope of insurance coverage under the St. Paul CGL policy. (Cf. *Mirpad, LLC v. California Ins. Guarantee Assn.* (2005) 132 Cal.App.4th 1058, 1070–1073 [34 Cal.Rptr.3d 136] [where policy referred to "person" and "organization" separately and distinctly, the words must be given their separate and distinct meaning to avoid creating ambiguity and redundancy]; see also *Golden Eagle Ins. Corp. v. Cen-Fed, Ltd.* (2007) 148 Cal.App.4th 976, 991 [56 Cal.Rptr.3d 279] [following the court's prior holding in *Mirpad*].)

South Bay alternatively argues that if "person" does not include "organization" in referring to "person's right of privacy," then it is ambiguous and must be construed against St. Paul. As noted earlier, however, courts will not strain to create an ambiguity where none exists. (*Waller v. Truck Ins. Exchange, Inc., supra,* 11 Cal.4th at pp. 18–19.) Policy terms are ambiguous when they are capable of two or more constructions, *both* of which are reasonable. As the policy language here is not susceptible of two reasonable constructions, it is not ambiguous.

### c. The Intellectual Property Exclusion

Although the trial court rejected St. Paul's effort to show no potential coverage for South Bay's conduct as an "advertising injury offense," it nonetheless found summary judgment appropriate based on the policy exclusion for claims of intellectual property infringement. Under this provision no coverage is afforded if the alleged injury results from misappropriation of trade secrets or violation of other intellectual property rights or laws. In attempting to avoid the application of this coverage limitation, South Bay emphasizes that only one of SJC's claims was for trade secrets violation, and not all of the information taken from SJC was a "work of the mind." Because some of the material was client information and records, it "cannot be

---

[6] "The extent of any privacy rights of a business entity is unsettled." (*Volkswagen of America, Inc. v. Superior Court* (2006) 139 Cal.App.4th 1481, 1492, fn. 9 [43 Cal.Rptr.3d 723]; compare *Roberts v. Gulf Oil Corp.* (1983) 147 Cal.App.3d 770, 793 [195 Cal.Rptr. 393] [state Constitution protects the privacy rights of people, not corporations] and *Zurich American Ins. Co. v. Superior Court* (2007) 155 Cal.App.4th 1485, 1504–1505 [66 Cal.Rptr.3d 833] [following *Roberts* and declining to address federal constitutional privacy right] with *H & M Associates v. City of El Centro* (1980) 109 Cal.App.3d 399, 410 [167 Cal.Rptr. 392] ["businesses, regardless of their legal form, have zones of privacy which may not be legitimately invaded"]; see also *Connecticut Indemnity Co. v. Superior Court* (2000) 23 Cal.4th 807, 817 [98 Cal.Rptr.2d 221, 3 P.3d 868] [assuming without deciding that insured corporations have constitutional and statutory privacy rights]; *Hecht, Solberg, Robinson, Goldberg & Bagley LLP v. Superior Court* (2006) 137 Cal.App.4th 579, 593–594 [40 Cal.Rptr.3d 446] [same as applied to partnerships].)

excluded as intellectual property under St. Paul's definition because pure factual data cannot constitute a 'work of the mind.' "

■ South Bay correctly points out that exclusions must be stated in clear and unmistakable language and are interpreted narrowly against the insurer. (*TRB Investments, Inc. v. Fireman's Fund Ins. Co.*, *supra*, 40 Cal.4th at pp. 27–28; *MacKinnon v. Truck Ins. Exchange, supra*, 31 Cal.4th at p. 648.) But even exclusionary language must be construed in the context of the policy as a whole, and in the circumstances of that case, and "cannot be found to be ambiguous in the abstract." (*Producers Dairy Delivery Co. v. Sentry Ins. Co.* (1986) 41 Cal.3d 903, 916, fn. 7 [226 Cal.Rptr. 558, 718 P.2d 920].) Here the challenged exclusion is clear and explicit; it expressly states that in addition to the listed forms of intellectual property infringement, there is no coverage for "*any other injury or damage that's alleged in any claim or suit which also alleges any such infringement or violation.*" (Italics added.) (Cf. *Molecular Bioproducts, Inc. v. St. Paul Mercury Ins. Co.* (S.D.Cal., July 9, 2003, No. 03-0046-IEG(LSP)) 2003 WL 23198852, p. *5 [where underlying suit contains patent infringement claim, intellectual property exclusion eliminates coverage for claims " 'alleged in . . . suit that also alleges any such . . . infringement' "]; compare *Align Technology, Inc. v. Federal Ins. Co.* (N.D.Cal. 2009) 673 F.Supp.2d 957, 970–971 [defamation and unfair competition claims not clearly within reach of intellectual property exclusion] and *KLA-Tencor Corp. v. Travelers Indem. Co. of Illinois* (N.D.Cal., Apr. 11, 2003, No. C-02-05641 RMW) 2003 WL 21655097, pp. *5–*6 [disparaging statements not "directly or indirectly related to" intellectual property infringement within the meaning of exclusion language].)

■ In summary, we conclude that the CGL policy St. Paul issued to South Bay did not offer coverage against the types of claims brought by SJC. Although an insurer's duty to defend is broader than its duty to indemnify, " 'the insurer need not defend if the third party complaint *can by no conceivable theory raise a single issue which could bring it within the policy coverage.*' " (*Montrose Chemical Corp. v. Superior Court* (1993) 6 Cal.4th 287, 300 [24 Cal.Rptr.2d 467, 861 P.2d 1153], quoting *Gray v. Zurich Insurance Co.* (1966) 65 Cal.2d 263, 275, fn. 15 [54 Cal.Rptr. 104, 419 P.2d 168].) Thus, "where the extrinsic facts eliminate the potential for coverage, the insurer may decline to defend even when the bare allegations in the complaint suggest potential liability. [Citations.] This is because the duty to defend, although broad, is not unlimited; it is measured by the nature and kinds of risks covered by the policy." (*Waller v. Truck Ins. Exchange, Inc.*, *supra*, 11 Cal.4th at p. 19; see *Pardee Construction Co. v. Insurance Co. of the West* (2000) 77 Cal.App.4th 1340, 1350 [92 Cal.Rptr.2d 443].) Here St. Paul has demonstrated, "by reference to undisputed facts, that the claim cannot be covered." (*Ringler Associates Inc. v. Maryland Casualty Co.* (2000) 80 Cal.App.4th 1165, 1186 [96 Cal.Rptr.2d 136], italics omitted.) Given the

underlying facts and the policy language at issue, there is no theory on which SJC's action could conceivably be covered. We therefore agree with the superior court that St. Paul was entitled to summary judgment in South Bay's action against it.

### Disposition

The judgment is affirmed. Costs on appeal are awarded to St. Paul.

Rushing, P. J., and Premo, J., concurred.