[No. B224156. Second Dist., Div. One. Nov. 1, 2011.]

THE OGLIO ENTERTAINMENT GROUP, INC., et al., Plaintiffs and Appellants, v.
THE HARTFORD CASUALTY INSURANCE COMPANY, Defendant and Respondent.

574

**COUNSEL**

Ford & Serviss, William H. Ford III and Claudia J. Serviss for Plaintiffs and Appellants.

Mendes & Mount, Dean B. Herman and Catherine L. Rivard for Defendant and Respondent.

**OPINION**

**JOHNSON, J.**—The trial court sustained, without leave to amend, the demurrer of The Hartford Casualty Insurance Company (Hartford) to The Oglio Entertainment Group, Inc., and Carl Caprioglio's (collectively, Oglio)

first amended complaint for breach of contract and breach of the implied covenant of good faith and fair dealing, based on Hartford's denial of coverage. Oglio appeals the order. We affirm.

## BACKGROUND

Oglio is an independent music label based in Los Angeles County. Hartford issued a "Spectrum" business insurance policy to Oglio, effective January 13, 2006, through January 13, 2007. After Hartford disclaimed coverage when Oglio was sued by one of its recording artists during the policy period, Oglio filed an action for breach of contract and other claims against Hartford, and the trial court sustained Hartford's demurrer without leave to amend.

I.   *The underlying complaint by Davis against Oglio*

On January 19, 2006, recording artist Mark Jonathan Davis sued Oglio in Los Angeles Superior Court. The complaint alleged that Davis was a recording artist recording and performing music under the professional name " 'Richard Cheese' . . . a comedy character created by [Davis] who performs 'lounge' or 'swing-style' versions of current and popular rock, hip-hop and pop songs." As Richard Cheese, Davis had recorded four albums, performed live concerts, appeared on television programs, given interviews and performed on broadcast and satellite radios, and had his recordings featured in motion pictures. As a result, as Richard Cheese, Davis "has developed such a recognizable name among the general public over the last five years that he is able to perform and sell records featuring his musical performances all over the world."

On August 1, 2000, Davis entered into a recording agreement with Oglio, which provided that Davis, as Richard Cheese, would record an album of lounge-style recordings of popular songs (tentatively entitled "Lounge Against the Machine" (LATM)) for distribution by Oglio. The recording agreement was for three years (Aug. 1, 2000, to Aug. 1, 2003), and provided that Oglio owned the copyrights to the recordings, excluding publishing copyrights, and Oglio would pay royalties to Davis. During the three-year period, Oglio had the right to use Davis's professional name (Richard Cheese) and likeness to advertise, market, and promote the album. This included the right to use "www.richardcheese.com" as Oglio's Internet domain name to promote the album. The recording agreement also prohibited Davis from recording or distributing any similar recordings (lounge music interpretations of popular music) during the three-year term, and during an additional period, prohibited Davis from performing any of the music for recording by anyone other than Oglio. Oglio had the option of two years after

the execution of the recording agreement and upon payment of a minimum advance of $15,000, to require Davis to record a second album on the same terms.

The complaint further alleged that LATM was a financial success "[a]s the first comedy/music album of its kind." When in 2001 Oglio attempted to exercise its option for Davis to record a second album (lounge-style versions of songs originally performed by Ozzy Osbourne), Oglio sought to reduce the advance to $7,000. After Davis refused, Oglio attempted to modify the agreement to grant Oglio the right to a third album by Davis, which Davis also refused. Oglio then threatened to hire a different artist to record similar music, and "followed through on their threats by seeking out, in bad faith and with the intention to injure [Davis]'s recording career, other potential recording artists to record competing lounge-style versions of popular songs." In 2002, Oglio released two albums: " 'Diary Of A Loungeman' " by " 'Bud E. Luv,' " consisting of lounge versions of Ozzy Osbourne songs, and " 'Sub-Urban' " by " 'Jaymz Bee & The Deep Lounge Coalition,' " another lounge-style artist (the Competing Albums). Oglio's intent was "to use the Competing Albums as a way to piggyback on the success enjoyed by [Davis]'s . . . Album and to trade on the goodwill and public recognition earned by [Davis] . . . . Both the names of the competing artists and the titles of the Competing Albums were obviously intended by Oglio to attract fans of Richard Cheese's lounge-style versions of songs and to capitalize on [Davis]'s celebrity. Oglio's actions in this regard caused injuries to [Davis] by (i) diverting sales from [Davis]'s . . . Album to Oglio's Competing Albums, and (ii) causing ancillary damages to [Davis], such as reducing his ability to fairly negotiate with [Oglio], and reducing the value and unique goodwill of [Davis]'s Professional Name throughout the entertainment industry."

Oglio declined to exercise the second album option and notified Davis that he was " 'free to record and release CDs under the name Richard Cheese.' " Davis continued to release albums, make appearances on television and radio, and perform concert engagements as Richard Cheese. After the expiration of the recording agreement on August 1, 2003, Oglio continued to use Richard Cheese as the domain name to market and promote Oglio's albums, including Davis's LATM album and the Competing Albums.

The complaint alleged causes of action for breach of contract, violation of Davis's right of publicity, and intentional interference with prospective economic advantage. A fourth cause of action for breach of the covenant of

good faith and fair dealing alleged that after Davis refused to accept Oglio's offer of a $7,000 advance for a second album, Oglio in bad faith and with the intention to damage Davis's recording career, signed the competing artists to record and release albums similar to Davis's LATM album. Oglio recorded and released the Competing Albums with the intent to injure Davis's professional reputation and goodwill and to divert sales from Davis's future albums, in an attempt to "strong-arm" Davis into accepting the low advance, while the recording agreement was still in effect. As to all four causes of action, the complaint requested money damages and an injunction ordering Oglio to transfer the domain name to Davis.[1]

## II.  *Hartford's denial of coverage*

Oglio tendered defense to Hartford, and Hartford disclaimed coverage in a letter dated February 15, 2006. Oglio asked Hartford to reconsider the denial, arguing that Hartford had a duty to defend because the complaint alleged that Oglio's "advertisements featured on the internet" constituted " 'advertisement' " as used in the policy, and Davis had been injured by Oglio's "use of [Davis's] alleged proprietary name and advertising idea in connection with Oglio's promotions and marketing." Hartford again denied coverage because "[u]sing a stage name is not an 'advertising idea' as defined by the policy. Using another's domain name is not any enumerated covered offense. Even if it were, it would then fall under Exclusion p. (7)." Oglio once again asked for reconsideration, arguing that Davis's alleged injury was a violation of his right of publicity, which was included in the policy's coverage regarding the right of privacy (appropriation of Davis's name or likeness). On April 20, 2006, Hartford again disclaimed coverage, answering that the right of publicity was separable from the right of privacy, and the policy did not cover the right of publicity. In addition, the right of publicity was an intellectual property right which the policy specifically excluded from coverage, and the complaint did not allege a personal and advertising injury.

## III.  *Oglio's first amended complaint against Hartford*

On February 26, 2008, Oglio commenced this action by filing a complaint against Hartford, alleging breach of contract and breach of the implied covenant of good faith and fair dealing. Hartford answered and subsequently filed a motion for judgment on the pleadings, arguing that the complaint's

---

[1] Davis filed a first amended complaint in May 2006, after Hartford disclaimed coverage. Oglio does not allege that it ever submitted Davis's first amended complaint to Hartford. We therefore consider only the allegations in Davis's original complaint. Oglio eventually settled with Davis for $80,000 in September 2006.

claim for violation of the right of publicity was not covered and there was no allegation of the copying of an advertising idea, and further two policy exclusions applied. The trial court granted the motion on December 9, 2009, concluding that although Davis's claims fell within the scope of the policy, the exclusions applied and Hartford did not have a duty to defend Oglio. The court granted leave to amend because the complaint was Oglio's first pleading.

Oglio filed a first amended complaint on December 17, 2009. The first amended complaint quoted the portions of the Hartford policy that provided coverage for " 'personal and advertising injury,' " and alleged: "In [paragraph] 15 of both the underlying Complaint and First Amended Complaint, Davis alleged that Oglio sought out other potential recording artists to record competing lounge-style versions of popular songs. He alleged, '[O]ne such artist was "Bud E. Luv[,"] whose album entitled "Diary Of A Loungeman["] was composed entirely of lounge-style versions of Ozzy Osbourne songs.' Davis also alleged a second album, entitled 'Sub-Urban,' that featured the performances of 'Jaymz Bee & The Deep Lounge Coalition.' . . . Davis further alleged: 'Oglio's intent to use the Competing Albums as a way to piggyback on the success enjoyed by [Davis]'s LATM Album and to trade on the goodwill and public recognition earned by [Davis] is clear. Both the names of the competing artists and the titles of the Competing Albums were obviously intended by Oglio to attract fans of Richard Cheese's lounge-style versions of songs and to capitalize on [Davis]'s celebrity. Oglio's actions in this regard caused injuries to [Davis] by (i) diverting sales from [Davis]'s LATM Album to Oglio's Competing Albums, and (ii) causing ancillary damages to [Davis], such as reducing his ability to fairly negotiate with [Oglio], and reducing the value and unique goodwill of [Davis]'s Professional Name throughout the entertainment industry.' In [paragraph] 18 of both the Complaint and the First Amended Complaint, Davis alleged Oglio used the internet to market and promote Oglio's various albums, including its Competing Albums and the LATM Album."

Oglio's first amended complaint further alleged: "[T]he potential for covered liability . . . was based, at least in part, upon the copying of Davis's style of the name as an advertising idea" and "[paragraph] 19 of both of the *Davis* Complaints[2] specifically alleged liability arising out of the copying of Davis's 'advertising idea,' i.e., using cheesy professional names, exemplified by ' "Bud E. Luv" ' and ' "Jaymz Bee & The Deep Lounge Coalition" ' for

[2] Paragraph 19 of Davis's original complaint alleges: "[Davis] has devoted 10 years of his time and efforts into creating, developing and promoting 'Richard Cheese.' As a result, [Davis]'s 'Richard Cheese' character has sold records and merchandise, and has performed in concerts, all over the world. [Davis] has, accordingly, generated substantial celebrity goodwill and value associated with the 'Richard Cheese' name both domestically and internationally."

singers to record lounge-style versions of popular songs as well as marketing and promoting these 'Competing Albums' on the internet on the same website as the LATM Album by Richard Cheese. The alleged potential liability was not solely or exclusively dependent upon the use of *Davis'*[s] name or product in the email address, domain name or metatag."

Hartford filed a demurrer to the first amended complaint, arguing that coverage was barred by the policy's "domain name" and " 'intellectual property' " exclusions, and that no advertising injury occurred because "stealing someone's *product* idea does not become an 'advertising injury' just because the insured advertises the stolen product. Oglio's argument confuses an 'advertisement' with the thing advertised. The Policy Language, however, necessarily incorporates a distinction between the offense of copying an 'advertising idea' from merely copying the product being advertised." To the extent that Davis's musical style and artist name were protectable, any use by Oglio would be barred by the intellectual property exclusion. "[T]here simply is no potentially covered 'advertising injury' claim to be found in Davis's pleadings. Hartford had no duty to defend Oglio in the Davis Action."

The trial court agreed with Hartford and sustained the demurrer without leave to amend in an order dated March 10, 2010, concluding that Davis's complaint did not allege an advertising injury, and the domain name exclusion and the intellectual property exclusion applied. Oglio filed a notice of appeal on April 30, 2010.[3]

## DISCUSSION

I. *The trial court properly sustained the demurrer without leave to amend*

We review independently the trial court's sustaining of the demurrer, determining de novo whether the complaint states a cause of action. (*McCall v. PacifiCare of Cal., Inc.* (2001) 25 Cal.4th 412, 415 [106 Cal.Rptr.2d 271, 21 P.3d 1189].) When the trial court has sustained the demurrer without leave to amend, we "decide whether there is a reasonable possibility that the defect can be cured by amendment: if it can be, the trial court has abused its discretion and we reverse." (*City of Dinuba v. County of Tulare* (2007) 41

---

[3] The record on appeal did not include a judgment of dismissal. Oglio's appeal was therefore technically premature. (*Zipperer v. County of Santa Clara* (2005) 133 Cal.App.4th 1013, 1019 [35 Cal.Rptr.3d 487].) We directed Oglio to obtain an order of dismissal. Oglio subsequently filed in this court a signed order dismissing the complaint. The order was filed in superior court on August 18, 2011.

Cal.4th 859, 865 [62 Cal.Rptr.3d 614, 161 P.3d 1168].) Oglio has the burden to show that it could have amended the complaint to cure the defect. (*Align Technology, Inc. v. Tran* (2009) 179 Cal.App.4th 949, 959 [102 Cal.Rptr.3d 343].) We read the complaint as a whole and treat the demurrer as admitting all the properly pleaded material facts, but we do not treat as admitted contentions, deductions, or conclusions of fact or law. (*Id.* at p. 958.)

### A. *The Davis complaint did not plead facts alleging advertising injury*

Oglio limits its appeal to the trial court's conclusion that Davis's underlying complaint did not allege an advertising injury which created a potential for coverage under the policy, and that therefore Hartford had no duty to defend.[4] As the reviewing court, we determine independently whether the provisions of the policy potentially covered Davis's lawsuit and thus gave rise to Hartford's duty to defend. (*S.B.C.C., Inc. v. St. Paul Fire & Marine Ins. Co.* (2010) 186 Cal.App.4th 383, 388 [112 Cal.Rptr.3d 40].)

#### 1. *The duty to defend*

"[A]n insurer has a duty to defend an insured if it becomes aware of, or if the third party lawsuit pleads, facts giving rise to the potential for coverage under the insuring agreement." (*Waller v. Truck Ins. Exchange, Inc.* (1995) 11 Cal.4th 1, 19 [44 Cal.Rptr.2d 370, 900 P.2d 619].) " 'The determination whether the insurer owes a duty to defend usually is made in the first instance by comparing the allegations of the complaint with the terms of the policy. Facts extrinsic to the complaint also give rise to a duty to defend when they reveal a possibility that the claim may be covered by the policy. [Citation.]' " "[F]acts known to the insurer and extrinsic to the third party complaint can generate a duty to defend, even though the face of the complaint does not reflect a potential for liability under the policy. [Citation.]" (*Montrose Chemical Corp. v. Superior Court* (1993) 6 Cal.4th 287, 295, 296 [24 Cal.Rptr.2d 467, 861 P.2d 1153].) "Any doubt as to whether the facts

---

[4] Paragraph 18 of Davis's complaint alleges that Oglio continued to use Richard Cheese as "the domain name to market and promote Oglio's various albums, including its Competing Albums and the LATM Album" after the recording agreement expired, despite Davis's requests that Oglio cease. Oglio does not argue that the trial court erred in concluding that there was no duty to defend based on this allegation, and a policy exclusion bars coverage for liability "arising out of the unauthorized use of another's name or product in your e-mail address, domain name or metatag, or any other similar tactics to mislead another's potential customers."

give rise to a duty to defend is resolved in the insured's favor. [Citation.]" (*Horace Mann Ins. Co. v. Barbara B.* (1993) 4 Cal.4th 1076, 1081 [17 Cal.Rptr.2d 210, 846 P.2d 792].) "An insurer is also obligated to provide a defense where an exclusion arguably applies but may reasonably be interpreted to be inapplicable to the alleged facts." (*Aroa Marketing, Inc. v. Hartford Ins. Co. of Midwest* (2011) 198 Cal.App.4th 781, 786 [130 Cal.Rptr.3d 466].)

### 2. *The policy language*

■ " '[I]nterpretation of an insurance policy is a question of law.' [Citation.] 'While insurance contracts have special features, they are still contracts to which the ordinary rules of contractual interpretation apply.' [Citation.]" "If the policy language 'is clear and explicit, it governs.' [Citation.]" "We begin our analysis by examining the policy's coverage clauses. [Citation.]" (*Palmer v. Truck Ins. Exchange* (1999) 21 Cal.4th 1109, 1115 [90 Cal.Rptr.2d 647, 988 P.2d 568].) " ' "The 'clear and explicit' meaning of these provisions, interpreted in their 'ordinary and popular sense,' unless 'used by the parties in a technical sense or a special meaning is given to them by usage' [citation], controls judicial interpretation. [Citation.]" ' " (*MacKinnon v. Truck Ins. Exchange* (2003) 31 Cal.4th 635, 647–648 [3 Cal.Rptr.3d 228, 73 P.3d 1205].) ■ Coverage provisions are interpreted broadly to protect the insured, and exclusionary clauses are interpreted narrowly against the insurer, especially when the coverage provision would lead an insured to reasonably expect that a claim was covered. The burden is on the insured to establish that the claim is within the scope of the policy's coverage, and on the insurer to establish that the claim is specifically excluded. (*Id.* at p. 648.)

The relevant coverage clauses in the Hartford policy state that Hartford will pay on behalf of the insured any damages incurred by the insured "because of . . . 'personal and advertising injury' to which the insurance applies," and that Hartford will also have the duty to defend the insured against a suit seeking those damages. The policy defines " 'advertising injury' " as injury arising out of "[c]opying, in your 'advertisement,' a person's or organization's 'advertising idea' or style of 'advertisement.' " " 'Advertisement' " is defined as "the widespread public dissemination of information or images that has the purpose of inducing the sale of goods, products or services through" radio, television, billboard, magazine, or newspaper, as well as "[t]he Internet, but only that part of a web site that is about goods, products or services for the purpose of inducing the sale of goods, products or services," and "[a]ny other publication that is given widespread public distribution." The policy provides that advertisement does not include the design, printed material, or any images or information contained in or on

the packaging or labeling of any goods or products, or an interactive conversation through a computer network. Finally, " '[a]dvertising idea' means any idea for an 'advertisement.' "

The policy excludes from coverage any advertising injury "[a]rising out of any violation of any intellectual property rights, such as patent, trademark, trade name, trade secret, service mark or other designation of origin or authenticity. However, this exclusion does not apply to infringement, in your 'advertisement,' of [¶] (a) Copyright; [¶] (b) Slogan, unless the slogan is also a trademark, trade name, service mark or other designation of origin or authenticity; or [¶] (c) Title of any literary or artistic work" (Exclusion 7). Exclusion 10 bars coverage for any advertising injury "[a]rising out of the unauthorized use of another's name or product in your e-mail address, domain name or metatag, or any other similar tactics to mislead another's potential customers."[5]

### 3. *The allegations in the underlying complaint*

Oglio argues that there was a potential for coverage based on paragraph 15 of Davis's complaint, in which Davis alleged that Oglio attempted to pressure Davis into modifying the recording agreement "by seeking out, in bad faith and with the intention to injure [Davis]'s recording career, other potential recording artists to record competing lounge-style versions of popular songs: incredibly, the very act which [Oglio] was expressly forbidden from doing pursuant to . . . the Recording Agreement! Notwithstanding its bad-faith tactics, Oglio signed two artists to record competing albums and released said albums by such competing artists in 2002, *when the Recording Agreement was still one year away from expiring*. One such artist was 'Bud E. Luv,' whose album entitled 'Diary Of A Loungeman' was composed entirely of lounge-style versions of Ozzy Osbourne songs. This was, essentially, the same album Oglio asked [Davis] to record for a reduced advance. The second competing album released by Oglio, entitled 'Sub-Urban,' featured the performances of a different lounge-style artist named 'Jaymz Bee & The Deep Lounge Coalition.' (The 'Diary Of A Loungeman' album and 'Sub-Urban' album shall sometimes be collectively referred to herein as the 'Competing Albums'.) Oglio's intent to use the Competing Albums as a way to piggyback on the success enjoyed by [Davis]'s LATM Album and to trade on the goodwill and public recognition earned by [Davis] is clear. Both the names of the competing artists and the titles of the Competing Albums were obviously intended by Oglio to attract fans of Richard Cheese's lounge-style versions of

---

[5] The policy also specifically excludes from coverage " '[p]ersonal and [a]dvertising [i]njury' " "[a]rising out of any breach of contract, except an implied contract to use another's 'advertising idea' in your 'advertisement.' " This exclusion was not argued by either party in the trial court.

songs and to capitalize on [Davis]'s celebrity. Oglio's actions in this regard caused injuries to [Davis] by (i) diverting sales from [Davis]'s LATM Album to Oglio's Competing Albums, and (ii) causing ancillary damages to [Davis], such as reducing his ability to fairly negotiate with [Oglio], and reducing the value and unique goodwill of the [Davis]'s Professional Name throughout the entertainment industry."

Oglio argues that paragraph 15 alleged facts supporting coverage of Davis's claim as a claim for advertising injury, defined in the policy as "[c]opying, in your 'advertisement,' a person's or organization's 'advertising idea' or style of 'advertisement.' " Hartford counters that the policy distinguishes the advertisement from the product being advertised, and that at best Davis's complaint alleged that Oglio copied Davis's *product*,[6] not an *advertisement* or style of advertisement promoting that product.

█ We agree with the trial court that Davis's complaint did not allege an advertising injury as defined in the Hartford policy. The policy language defines advertising injury as an injury arising out of "[c]opying, in your 'advertisement,' a person's or organizations 'advertising idea' or style of 'advertisement.' " Davis's complaint alleged that Oglio sought out other recording artists to record lounge-style versions of popular songs, and released the Competing Albums by Bud E. Luv and Jaymz Bee & The Deep Lounge Coalition while the recording agreement was in effect. This was an attempt to capitalize on the success of Davis's lounge-style recordings, diverting sales away from Davis's album and reducing the value of Davis's professional name, Richard Cheese. This does not allege that Oglio copied, in an *advertisement*, Davis's *advertising idea or style of advertisement*, but that Oglio sought out artists to copy Davis's *product* and later *sold* a competing *product*, injuring Davis's sales and the value of his professional name. There is no description of any advertisement used by Oglio, or any allegation that Oglio used an advertisement that copied an advertisement or advertising idea of Davis's. This is especially clear, given that the policy defines advertisement as the widespread dissemination of information or images with the purpose of selling a product,[7] and the complaint alleged that Oglio copied Davis's *product*. Presumably, Davis's professional name Richard Cheese would appear on the packaging of his product (his lounge-style album), but

---

[6] On appeal, Oglio characterizes Oglio's product as "competing cheesy-named artists performing lounge-style singing acts." Oglio's first amended complaint characterizes Davis's complaint as alleging advertising injury arising out of Oglio's use of "cheesy professional names . . . for singers to record lounge-style versions of popular songs." Davis's complaint does not use the word "cheesy," which as used by Oglio in its brief, has the slang meaning "[o]f poor quality; shoddy." (American Heritage Dict. (2d college ed. 1982) p. 263.)

[7] Under earlier Hartford policy language that provided coverage for " 'misappropriation of advertising ideas or style of doing business,' " and which did not define "advertising," Davis might have had a better argument. (See *Peerless Lighting Corp. v. American Motorists Ins. Co.*

the policy's definition specifically provides that "advertisement" does not include printed material, images, or information contained in packaging or labeling of a product. Oglio does not point to any facts known to Hartford and extrinsic to Davis's complaint that would generate a duty to defend not found on the face of the complaint. Davis's complaint does not allege facts constituting an "advertising injury" which generated a duty to defend under the policy.[8]

B. *The trial court did not abuse its discretion in denying leave to amend*

" 'It is an abuse of discretion to deny leave to amend if there is a reasonable possibility that the pleading can be cured by amendment. [Citation.] *Regardless of whether a request therefore was made, unless the complaint shows on its face that it is incapable of amendment, denial of leave to amend constitutes an abuse of discretion.* [Citation.] The burden is on the plaintiff to demonstrate how he or she can amend the complaint. It is not up to the judge to figure that out. [Citation.] Plaintiff can make this showing in the first instance to the appellate court. [Citations.]' " (*Lee v. Los Angeles County Metropolitan Transportation Authority* (2003) 107 Cal.App.4th 848, 854 [132 Cal.Rptr.2d 444].)

At the hearing on the demurrer, Oglio's counsel referred to ways that Oglio could have clarified the allegations in Oglio's first amended complaint against Hartford, and on appeal Oglio argues that it would have made those changes if the trial court had granted leave to amend. The changes, however, would have only restated Oglio's legal conclusions regarding the language in Davis's complaint. No amendment of Oglio's complaint could have changed the allegations of Davis's complaint, which considered in light of the policy language did not establish that Hartford had a duty to defend Oglio.

---

(2000) 82 Cal.App.4th 995, 1000, 1007–1008 & fn. 4 [98 Cal.Rptr.2d 753] ["infringement of trade dress arguably qualifies as '[m]isappropriation of advertising ideas or style of doing business' " where policy included that language].)

Oglio cites *Australia Unlimited v. Hartford Cas. Ins. Company* (2008) 147 Wn.App. 758 [198 P.3d 514], in support of its argument that its complaint alleged advertising injury. In that case, however, the complaint alleged that the defendant copied not only the appearance of the product (footwear), but also "*associated marketing and sales materials* [which] share an overall unique look and feel," and Hartford did not dispute that the allegation constituted " 'advertisement' " under the policy. (*Id.*, 198 P.3d at p. 519.) No such allegation appears in Davis's complaint.

[8] Given our conclusion that Davis's complaint did not allege an "advertising injury," we need not address whether the policy exclusions applied.

## DISPOSITION

The judgment is affirmed. Respondents shall recover costs on appeal.

Mallano, P. J., and Chaney, J., concurred.

A petition for a rehearing was denied November 28, 2011, and appellants' petition for review by the Supreme Court was denied January 25, 2012, S198618.