Filed 3/9/15

**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION TWO

| | |
|---|---|
| ALTERRA EXCESS AND SURPLUS INSURANCE COMPANY, Plaintiff and Respondent, v. ESTATE OF BUCKMINSTER FULLER, Defendant and Appellant. | A140453 (San Francisco County Super. Ct. No. CGC-12-522867) |

The Estate of Buckminster Fuller (Estate) appeals from a judgment on the pleadings holding that Alterra Excess and Surplus Insurance Company (Alterra) had no duty to defend, and therefore no duty to indemnify, its insured in an action brought by the Estate against the insured. The basis of the judgment was that an exclusion in the Alterra policy, referred to by all below as the "intellectual property" exclusion, applied to preclude any obligation on the part of Alterra. We reach the same conclusion, and we affirm.

**BACKGROUND**

**General Historical Background**

R. Buckminster Fuller, nicknamed "Bucky" (Fuller), was a celebrated designer, author, and inventor. He was credited with many, and diverse, creations, and was particularly well known for popularizing the geodesic dome. He died in 1983. According to the Estate's own pleadings, in 1985 it registered its claim as the successor-in-interest to all of Fuller's rights, and has "licensed those rights on many occasions. The licensees include Apple Computer, which used Bucky's image (along with those of John Lennon, Pablo Picasso, Albert Einstein, Mahatma Gandhi, Frank

1

Lloyd Wright and others) in its 'Think Different' advertising campaign. In 2004, the U.S. Postal Service licensed the rights to Bucky's image for a postage stamp. The stamp artwork is a painting which originally appeared on the cover of Time magazine in 1964 depicting Bucky's head in the pattern of a geodesic dome. In 2003, Xerox Corporation licensed rights to Bucky's name and likeness." In short, it appears that various commercial enterprises have used Fuller, and perhaps his nickname, to assist in the marketing of their product.

At some point, Maxfield & Overton Holdings, LLC (Maxfield) entered the picture, attempting to do just that—apparently without permission or payment. Specifically:

Beginning at least as early as 2009, Maxfield manufactured and distributed several products under the Buckyball and related trademarks. Again according to the Estate's pleadings, these items included several variations on Buckyballs, Buckyball gift packs, Buckycubes, Bucky sidekick, and The Big Book of Bucky. Elaborating, the Estate described some of this as follows:

"13. According to the recent press release by [Maxfield], Buckyballs were 'inspired and named after famous architectural engineer and inventor, R. Buckminster Fuller, Buckyballs and Buckycubes are the world's most popular adult desktoys and have been compared to famous desktoys of yore such as Newton's Cradle, the Zen Garden, and Pin Art. Buckyballs and Buckycubes are distributed by NYC based Maxfield & Oberton Holdings. Founded in 2009, the company's products are sold today in over 5,000 US retail locations and 15 countries around the world.' It claims to be the world's best selling desktoy. [¶] . . . [¶]

"15. Buckyballs are 216 round rare earth magnets packaged in a cube shape. The packaging states: Buckyballs by Zoomdoggle. The included Quick State Guide demonstrates several shapes that can be made with the round magnets. In order of apparent difficulty, those shapes are the chain, the tube, the sheet, the hexagon, triangles, tricks and the cube. Only the triangle can be formed into a shape that resembles the Carbon 60 buckyball sphere. The 'Let's Get Tricky' section states: 'Anything is possible in the world of Bucky.' [¶] . . . [¶]

"18. The Big Book of Bucky is a paperback book which provides instructions on how to make various shapes with Buckyballs. The book states: 'Buckyballs were named for Buckminster Fuller.' After briefly summarizing Bucky's accomplishments, it states: 'He was smart, He was crazy. He was fun. Remind you of anything?'

"19. Until recently, the Frequently Asked Questions page on [Maxfield's] website (www.getbuckyballs.com) posted this question and answer: '3. Where does the name Buckyballs come from?' 'The name Buckyballs is a nod to Buckminster 'Bucky' Fuller, a famous architectural-type best known for the geodesic dome (a sphere made of triangles). It's a fun shape to make with Buckyballs. FUN FACT: The Carbon 60, one of the strongest atomic structures known to man, are sometimes called Fullerenes. They too were named after Fuller for their similarity to geodesic domes.' "

Such conduct was the basis of the first of the two lawsuits involved here: the Estate's action alleging that the commercial use of Fuller's name was not authorized.

## Procedural Background

### The Underlying Action

On May 18, 2012, the Estate filed an action against Maxfield in the United States District Court, Northern District of California: *Estate of Buckminster Fuller v. Maxfield & Oberton Holdings, LLC* , Case No.: 5-12-CV-02570 (for consistency with the briefing, the underlying action). The underlying action alleged four claims: (1) unfair competition in violation of 15 United States Code section 1125(a)—Lanham Act; (2) invasion of privacy (appropriation of name and likeness); (3) unauthorized use of name and likeness in violation of California Civil Code section 3344.1; and (4) violation of California Business and Professions Code section 17200 et seq. The Estate represented to the district court that the underlying action was properly venued in San Francisco because it was an "intellectual property matter."

Max Specialty Insurance Co., a predecessor to Alterra, had issued an insurance policy to Maxfield that had become effective June 4, 2010, the specific terms of which will be discussed in detail below. Maxfield tendered defense of the underlying action to

3

Alterra, which agreed to defend under a reservation of rights and appointed *Cumis* counsel (Civil Code § 2860) to defend the case.

Soon thereafter Alterra filed the second lawsuit involved here: the action for declaratory relief.

**The Coverage Action**

On August 1, 2012, Alterra filed suit in the San Francisco Superior Court, naming two defendants, Maxfield and the Estate (the coverage action). The complaint sought declaratory relief and reimbursement, more specifically a declaration that Alterra's policy did not provide coverage and therefore Alterra had no duty to defend. According to Alterra, it named the Estate as a defendant so as to bind it by the outcome of the coverage action because, as a potential judgment creditor of Maxfield, the Estate could have a claim against Alterra should it prevail in the underlying action. (Ins. Code, § 11580.)

The Estate's involvement in the coverage action—at least its initial involvement— was short lived, as by October 29, the Estate and Alterra entered into a stipulation under which the Estate would be dismissed from the coverage action without prejudice in return for the its agreement to be bound by it. The stipulation was signed on behalf of the Estate by its attorney, Thomas A. Cohen. The coverage action continued against Maxfield.

On December 10, 2012, Alterra filed a first amended complaint, with 28 paragraphs of allegations.

On that same day, Maxfield filed its answer to the first amended complaint, signed by Marc R. Lewis, of the firm of Lewis & Llewellyn, LLP. Tellingly, that answer acknowledged that Alterra's position was well founded—and Alterra was entitled to the declaratory judgment it sought. Specifically, Maxfield's answer admitted all 28 paragraphs in the amended complaint; stated that Maxfield had "no affirmative defenses"; and prayed for a judicial declaration that Alterra had no duty to defend or indemnify Maxfield.

With that, on January 8, 2013, Alterra filed a motion for judgment on the pleadings, set for hearing on February 4. This caused the Estate, and apparently its

attorney Cohen, to stir, and to reenter the case, despite its earlier stipulation to be dismissed from it.

Beginning in mid-January 2013, and acting without leave of court, the Estate on its own behalf filed a general denial to Alterra's first amended complaint. Then, on January 22, 2013, purporting to act as the "Assignee of the [Maxfield] Liquidating Trust," the Estate filed a first amended answer which denied the allegations of Alterra's first amended complaint. On that same date, and again purporting to act as "as assignee of the [Maxfield] Liquidating Trust," the Estate filed opposition to Alterra's motion for judgment on the pleadings. All the pleadings were signed by attorney Cohen.

On February 5, 2013, the Estate, once again acting on its own behalf, filed a motion for relief from its dismissal from the coverage action, moving under Code of Civil Procedure section 473. A declaration from attorney Cohen accompanied the motion for relief, which declaration detailed the machinations that had occurred behind the scenes. We quote Mr. Cohen's declaration in some detail:

"2. Maxfield & Oberton, LLC manufactured and sold popular desk toys called Buckyballs, Buckycubes, Bucky sidekick and the Big Book of Bucky and had filed trademark applications for puzzles—Buckybars, BuckyBricks, BuckyBlocks, BuckyBigs— and for a vitamin supplement: BuckyBalls. [Maxfield] claimed that Buckyballs and Buckycubes were the world's most popular desktoys. [Maxfield] states unequivocally in printed material and on its website that 'Buckyballs were named for Buckminster Fuller.' The Estate filed suit on May 18, 2012 in U.S. District Court for the Northern District of California alleging that the commercial use of Fuller's name was not authorized and therefore violated Section 43 of the Lanham Act, the statutory protections of California Civil Code § 3344.1, the common law rights of privacy, and California's unfair competition law.

"3. [Maxfield] tendered the defense of that suit to Alterra under its Commercial General Liability policy. Alterra agreed to defend under a reservation of rights. On August 1, 2012 it filed this action against [Maxfield] and the Estate. Alterra then wrote the Estate: 'We included the Estate as a defendant to bind it to the outcome of the

5

action' . . . and offered to 'dismiss the Estate without prejudice if the Estate would agree to be bound by the judgment.' On September 10, 2012, with my client's consent, I agreed to the Stipulation. At that time, I had no way of knowing that [Maxfield] would suddenly decide to go out of business. Based on viewing its website, I am informed and believe and on that basis allege that [Maxfield] was still selling Buckyballs online and had even introduced new magnetic products that were too big to swallow and thus presumably not a concern of the CPSC. Alterra's attorney signed the Stipulation on October 29, 2012 and filed a Request for Dismissal on October 31, 2012. There is no evidence to date that the Clerk of the Court has consented to the dismissal.

"4. Meanwhile, [Maxfield]'s counsel in the underlying federal action filed a comprehensive Motion to Dismiss. That Motion was denied in all significant respects in a seventeen page Order. (*Estate of Fuller v. Maxfield & Oberton Holdings, LLC*, *supra,* 2012 U.S. Dist. LEXIS 158539.)

"5. Unrelated to the California litigation, the United States Consumer Product Safety Commission took the relatively rare step in July 2012 of filing an administrative complaint against [Maxfield], demanding that the company stop making Buckyballs, warn consumers that its products are dangerous and offer them a refund. . . .

"6. [Maxfield] initially offered a vigorous legal and public relations defense, but when retailers stopped carrying the products, [Maxfield] could not effectively continue. In early January 2013, I talked by phone with Julie Teicher, the Trustee of the [Maxfield] Liquidating Trust. She informed me that on December 27, 2012 [Maxfield] stopped doing business, dissolved its Delaware LLC and created the [Maxfield] Liquidating Trust (the Trust). It was not until late December that I had any reason to believe that [Maxfield] was no longer motivated to continue to assert its rights to insurance coverage. Until its lack of motivation became apparent, there was no need for the Estate to enter the fray.

"7. In December 2012, an answer to Alterra's First Amended Complaint (FAC) was filed, presumably by [Maxfield]'s attorneys, prematurely and without a proof of service. The Amended Answer completely negated [Maxfield]'s original Answer to a

6

virtually identical Complaint, and admitted all claims and raised no affirmative defenses. . . .

"8. On January 17, 2013, because the Clerk had not entered a dismissal against it, the Estate filed a general denial to the FAC. The Estate, as Assignee of the [Maxfield] Liquidating Trust, also filed an Amended Answer to the FAC on January 22, 2013. . . .

"9. Late in December, [Maxfield]'s federal court counsel, with the consent of [Maxfield], filed a motion for leave to withdraw in the federal, action—noting that a corporation cannot proceed pro se. Thus, [Maxfield] is apparently no longer defending the federal court action.

"10. The Estate received an Assignment of Claims as part of a settlement with the [Maxfield] Liquidating Trust. . . . The Estate has filed an opposition to Alterra's Motion for Judgment on the Pleadings, which also is scheduled to be heard on March 8, 2013. [¶] . . . [¶]

"12. Alterra will not be prejudiced if the Court grants the Estate relief from dismissal. It has only been about a month since [Maxfield] suddenly dissolved. Arthur Schwartz, Alterra's counsel, was not aware of the dissolution until I informed [*sic*] of it in early January. . . ."

As reflected in Mr. Cohen's declaration and the attached exhibits, on December 27, 2012, Maxfield had dissolved by filing a certified of cancellation of its limited liability company status with the Delaware Secretary of State, and had, as grantor pursuant to the Delaware Limited Liability Act, established the [Maxfield] Liquidating Trust, overseen by trustee Julie Beth Teicher, to wind up Maxfield's affairs.

These exhibits also showed that on January 18, 2013, the Estate had entered into a settlement agreement with trustee Teicher that resolved all claims between the Estate and Maxfield. That settlement agreement provided in pertinent part as follows, all redactions in original:

"e. Fuller [defined as the Estate and its co-executors] and the Trust have agreed to settle all issues, claims and disputes between them including those arising out of the

7

[infringement action] upon the terms and conditions set forth in this Agreement.
[¶] . . . [¶]

"1. *Settlement of Fuller Lawsuit claim.* Upon the execution of this Agreement by all of the undersigned Parties, Fuller shall have an allowed unsecured claim against the Trust in the amount of [redacted] (the Settlement Claim), subject to the following conditions:

"a. In the event Fuller recovers funds from Alterra, there shall be a dollar for dollar reduction of the Settlement Claim against the Trust. For example, if Fuller recovers [redacted] from Alterra, the claim against the Trust shall be reduced to [redacted].

"b. Nothing in this Agreement prohibits Fuller from collecting more than [redacted] from Alterra. In such event, there shall be no remaining claim by Fuller against the Trust and the Settlement Claim shall be $0.00. [¶] . . . [¶]

"3. *Mutual Release of All Claims*.

"a. . . . Fuller, on behalf of itself and its members, managers, officers, directors, employees, representatives, . . . hereby fully, finally and forever releases, relinquishes, waives and discharges [Maxfield], the Trustee and the Trust . . . from any and all rights, claims, . . . lawsuits . . . from the beginning of time to the date of this Agreement, including, but not limited to the [underlying action] except for those claims which can be pursued against Alterra."

As indicated, pursuant to the Delaware Limited Liability Act (18 Del. Code, § 803), Maxfield's dissolution prohibited it from defending any action. In light of this, *Cumis* counsel withdrew, leaving Maxfield unrepresented. At this point, Alterra intervened in the underlying action to defend Maxfield's position. The underlying action has since been stayed pending resolution of this coverage action.

On May 8, 2013, the trial court granted the Estate's motion for relief, allowing it to appear in the coverage action through its previously filed answer. The court also denied without prejudice Alterra's motion for judgment on the pleadings.

8

On July 30, 2013, Alterra filed a renewed motion for judgment on the pleadings, asserting three separate, and independent, bases, two of which argued that the underlying action was excluded under exclusions c and i in the Alterra policy. The motion was accompanied by a request for judicial notice.

The Estate filed opposition, along with its own request for judicial notice. The Estate did not object to Alterra's request for judicial notice.

Following Alterra's reply, the motion came on for hearing on September 6, 2013. On that same day, the trial court entered its order granting the motion without leave to amend. The order stated it was based "on the intellectual property exclusion. (See *Aroa Marketing, Inc. v. Hartford Ins. Co. of the Midwest* (2011) 198 Cal.App.4th 781, 788 [(*Aroa*)].)"

Judgment was thereafter entered, declaring that "Alterra has no obligation to defend or indemnify Maxfield" in the underlying action. The Estate filed a timely appeal.

### SUMMARY OF PARTIES' CONTENTIONS

The Estate makes two arguments why the judgment should be reversed: (1) exclusion i., on which the trial court relied, is "neither plain nor clear"; and (2) *Aroa*, on which the trial court relied, is distinguishable "both on its facts and because it failed to apply the conspicuous, plain and clear standards." Alterra asserts three separate, and independent, bases to affirm, that coverage for the underlying action is barred by any of three alternatives: (1) by exclusion i, the intellectual property exclusion; (2) by exclusion c, the first publication exclusion; and (3) by the settlement and release between the Estate and Maxfield made without the consent of Alterra. We conclude that exclusion i applies, and affirm on that basis, and thus need not reach Alterra's other two arguments.

### DISCUSSION

**Standard of Review**

" 'A motion for judgment on the pleadings, made after the time for a demurrer has expired, in all other respects is the equivalent of a general demurrer. Like a demurrer, grounds for the motion must appear on the face of the complaint or be based on facts

9

capable of judicial notice. We review the complaint de novo to determine whether the complaint states a cause of action, as a matter of law.' [Citation.]" (*Caldera Pharmaceuticals, Inc. v. Regents of University of California* (2012) 205 Cal.App.4th 338, 350; see also *Barker v. Hull* (1987) 191 Cal.App.3d 221, 226-227 [judicial notice proper to consider prior action between the parties as basis for collateral estoppel].)

In *Allstate Ins. Co. v. Kim W.* (1984) 160 Cal.App.3d 326, 330, our colleagues in Division Three noted that "A motion for judgment on the pleadings is an appropriate means of obtaining an adjudication of the rights of the parties in a declaratory relief action if those rights can be determined as a matter of law from the face of the pleading attacked, together with those matters of which the court may properly take judicial notice." And they went on to affirm such a judgment because there was no coverage under the policy there. Likewise here.

**The Applicable Insurance Law**

We recently distilled the governing law, in *North Counties Engineering, Inc. v. State Farm General Ins. Co.* (2014) 224 Cal.App.4th 902, 919: "A duty to defend exists whenever the lawsuit against the insured seeks damages on any theory that, if proved, would be covered by the policy. Thus, a defense is excused only when ' "the third party complaint can by no conceivable theory raise a *single issue* which could bring it within the policy coverage." ' (*Montrose Chemical Corp. v. Superior Court* (1993) 6 Cal.4th 287, 300, some italics omitted.) In other words, 'the insured need only show that the underlying claim *may* fall within policy coverage; the insurer must prove it *cannot*.' (*Ibid.*) Thus, an insurer may have a duty to defend even when it ultimately has no obligation to indemnify, either because no damages are awarded in the underlying action or because the actual judgment is for damages not covered by the policy. (*Borg v. Transamerica Ins. Co.* (1996) 47 Cal.App.4th 448, 454.) If coverage depends on an unresolved dispute over a *factual* question, the very existence of that dispute would establish a possibility of coverage and thus a duty to defend. (*Horace Mann* [*Ins. Co. v. Barbara B.* (1993)] 4 Cal.4th [1076,] 1085.) [¶] Finally, any doubt 'as to whether the facts give rise to a duty to defend is resolved in the insured's favor.' [Citations.]"

Those liberal, pro-insured rules notwithstanding, there is no duty to defend if there is no potential for coverage. As the leading California insurance treatise puts it, "The insurer's duty to defend does *not* extend to claims for which there is no potential for liability coverage. This includes claims falling outside the scope of the insuring clause, or within an express exclusion from coverage, or barred by statutory or public policy limitations. 'The insurer need not defend if the third party complaint can by no conceivable theory raise a single issue which could bring it within the policy coverage' [Citations.]." (Croskey et al., Cal. Practice Guide: Insurance Litigation (The Rutter Group 2014) § 7:537, pp. 7B-16-17 (Croskey).)

As to how such a determination is made, other principles guide us, including that " '[w]hile insurance contracts have special features, they are still contracts to which the ordinary rules of contractual interpretation apply.' [Citations.] 'The fundamental goal of contractual interpretation is to give effect to the mutual intention of the parties. [Citation.]' [Citation.] 'Such intent is to be inferred, if possible, solely from the written provisions of the contract.' [Citation.] 'If contractual language is clear and explicit, it governs. (Civ. Code, § 1638.)' [Citation.] Moreover, if the policy's terms are ' "used by the parties in a technical sense or a special meaning is given to them by usage," ' this use or meaning 'controls judicial interpretation.' [Citation.]" (*La Jolla Beach & Tennis Club, Inc. v. Industrial Indem. Co.* (1994) 9 Cal.4th 27, 37.)

As our Supreme Court put it in its most recent pronouncement on the subject, "In determining whether a claim creates the potential for coverage under an insurance policy, 'we are guided by the principle that interpretation of an insurance policy is a question of law.' [Citation.] 'Under statutory rules of contract interpretation, the mutual intention of the parties at the time the contract is formed governs interpretation. (Civ. Code, § 1636.)' [Citation.] In determining this intent, '[t]he rules governing policy interpretation require us to look first to the language of the contract in order to ascertain its plain meaning or the meaning a layperson would ordinarily attach to it.' [Citation.] We consider the ' "clear and explicit" meaning of these provisions, interpreted in their "ordinary and popular sense," unless "used by the parties in a technical sense or a special meaning is

given to them by usage." ' [Citation.] We must also 'interpret the language in context, with regard to its intended function in the policy.' [Citation.]" (*Hartford Casualty Ins. Co. v. Swift Distribution, Inc.* (2014) 59 Cal.4th 277, 288.)

**The Policy**

Sometime in 2010, Alterra's predecessor issued Commercial Lines Common Policy no. MAX013100003783. It was effective June 4, 2010 to July 25, 2011, and the named insured was "Maxfield and Oberton Holdings, LLC dba Bucky Balls by Zoomdoggle." The policy included a "COMMERCIAL GENERAL LIABILITY COVERAGE" form which, as pertinent here, included "**COVERAGE B PERSONAL AND ADVERTISING INJURY LIABILITY**." That form went on to define the terms applicable here, as follows:

"14. 'Personal and advertising injury' means injury, including consequential 'bodily injury', arising out of one or more of the following offenses: [¶] . . . [¶]

"e. Oral or written publication, in any manner, of material that violates a person's right of privacy;

"f. The use of another's advertising idea in your 'advertisement;' or

"g. Infringing upon another's copyright, trade dress or slogan in your 'advertisement'."

Coverage B also contained exclusions, two of which, c and i, Alterra relied on in its motion for judgment. Thus, as pertinent here, Coverage B provided as follows:

"2. **Exclusions**

"This insurance does not apply to: [¶] . . . [¶]

"c. **Material Published Prior To Policy Period**

" 'Personal and advertising injury' arising out of oral or written publication of material whose first publication took place before the beginning of the policy period. [¶] . . .[¶]

"i. **Infringement Of Copyright, Patent, Trademark Or Trade Secret**

" 'Personal and advertising injury' arising out of the infringement of copyright, patent, trademark, trade secret or other intellectual property rights. Under this exclusion,

12

such other intellectual property rights do not include the use of another's advertising idea in your 'advertisement'. [¶] However, this exclusion does not apply to infringement, in your 'advertisement', of copyright, trade dress or slogan."

### Exclusion i. Applies Here

As indicated, the trial court held that Alterra had no obligation under the policy because exclusion i, which the court called the "intellectual property exclusion," applied here. As also indicated, the Estate asserts two fundamental contentions arguing that such conclusion was wrong: (1) the exclusion is not plain, clear, and conspicuous; and (2) *Aroa* is distinguishable "both on its facts and because it failed to apply the conspicuous, plain and clear standards."

As the leading treatise puts it, "[t]o be 'conspicuous, plain and clear,' coverage exclusions and limitations must meet *two separate tests*:

"—the limitation must be 'conspicuous' with regard to placement and visibility [citation], and

"—the language must be 'plain and clear' [citation]. [See *Travelers Prop. Cas. Co. of America v. Sup.Ct. (Braum)* (2013) 215 Cal.App.4th 561, 575–576]." (Croskey, *supra,* § 4:490, p. 4-80.) And whether an exclusion meets the requirement is a question of law. (*Hervey v. Mercury Cas. Co.* (2010) 185 Cal.App.4th 954, 962-963.) We decide that question of law favorably to Alterra.

The exclusions are on an Insurance Services Office (ISO) industry form (no. CG 00 01 12 07). The exclusions appear under a bold-faced heading "Exclusions," with each exclusion having its own bold-faced title. As our colleagues have held, these factors satisfy the "conspicuous, plain and clear" test for exclusions, i.e., that they "be positioned in a place and printed in a form that will attract the reader's attention." (*Travelers Ins. Co. v. Lesher* (1986) 187 Cal.App.3d 169, 184, disapproved on other grounds in *Buss v. Superior Court* (1997) 16 Cal.4th 35, 50, fn. 12; see *National Ins. Underwriters v. Carter* (1976) 17 Cal.3d 380, 384 [exclusion located under a bold-faced heading entitled "Exclusions" and appearing in the same style of print found elsewhere in the policy].)

It is noteworthy that every California case that has discussed the exclusion (or one like it) has found it applicable, without any concern that it was not clear or conspicuous. These cases include: *Aroa, supra,* 198 Cal.App.4th 781, 788–789; *Purplus Inc. v. Hartford Cas. Ins.* (N.D.Cal. March 19, 2013, C 12-03689) 2013 U.S. Dist. LEXIS 38367 at *15–16 [excluding claims of software piracy]; and *Basalite Concrete Prods., LLC v. National Union Fire Ins. Co. of Pittsburgh, P.A.* (E.D.Cal. May 16, 2013, C:12-02814) 2013 U.S. Dist. LEXIS 70597 at *9-10 [excluding claims of trademark and patent infringement, unfair competition, and dilution]. Also noteworthy is the fact that in its opposition below the Estate did not even make a similar argument, arguing only that the exclusion was "hopelessly ambiguous."

Finally, the Estate asserts the words "other intellectual property rights" in the exclusion cannot apply as they are "buried in an inconspicuous part of a single paragraph in small type in a 39 page contract." This ignores that courts applying the exclusion have never criticized the exclusion on this basis. And, as noted, the title of the exclusion starts with the word "**Infringement**"—in boldface yet—the very conduct the Estate itself alleged against Maxfield. Exclusion i. is conspicuous, plain, and clear. And also applicable to bar coverage for the Estate's claims here.

The fundamental position of the Estate is that the exclusion is entitled "Infringement of Copyright, Patent, Trademark or Trade Secret," and cannot reasonably be understood to apply to "intellectual property rights." We disagree.

*Aroa, supra,* 198 Cal.App.4th 781 is persuasive. There, a model named Radcliffe filed suit against Aroa Marketing, alleging that it had made unauthorized use of her image and likeness, diminishing her marketability and publicity value and depriving her of her right of publicity. (*Id.* at p. 785.) The suit asserted claims for "statutory and common law misappropriation of likeness, breach of contract, unjust enrichment, and unfair competition." (*Ibid.*)

Aroa tendered defense to Hartford, whose policy excluded "Personal and advertising injury" arising out of " ' "any violation of any intellectual property rights, such as copyright, patent, trademark, trade name, trade secret, service mark, or other

14

designation of origin or authenticity." ' " (*Aroa, supra,*198 Cal.App.4th at p. 785.) Hartford declined the tender, its declination letter stating, " '[i]t is well settled under California law, both statutory and common law, that, while the right of publicity is derivative from a right of privacy, it is clearly considered an intellectual property right which is specifically excluded from coverage under the Policy.' " (*Ibid.*)

Aroa settled Radcliffe's case, and then sued Hartford. Hartford demurred, which argued among other things that the causes of action were "excluded by the policy's intellectual property rights exclusion." (*Id.* at pp. 785-786.) The trial court sustained the demurrer, and the Court of Appeal affirmed, in language strikingly applicable here:

"Hartford contends the intellectual property rights exclusion applies in this case. The insurance policy at issue excluded coverage for ' "[p]ersonal and advertising injury" ' arising out of 'any violation of any intellectual property rights such as copyright, patent, trademark, trade name, trade secret, service mark or other designation of origin or authenticity.' 'The right of publicity, like copyright, protects a form of intellectual property that society deems to have some social utility.' (*Comedy III Productions* [*Inc. v. Gary Saderup, Inc.* (2001)] 25 Cal.4th [387,] 399; see also Black's Law Dict. [(10th ed. 2014) p. 930] ['intellectual property' defined to include 'publicity rights'].) Thus, the right of publicity is an intellectual property right, and right of publicity claims would be excluded from coverage under the intellectual property rights exclusion.

"Aroa contends the intellectual property rights exclusion does not apply to right of publicity claims because the right of publicity is not specifically listed in the exclusion. We disagree. The exclusion applies when the injury arises out of 'any violation of any intellectual property rights.' Even if this language is interpreted narrowly against the insurer, it clearly applies to bar claims based on the right of publicity, as that right has been held to be an intellectual property right. Furthermore, the fact that the right of publicity is not specifically listed after the phrase 'any intellectual property rights' does not suggest the exclusion does not apply. The exclusion provides that intellectual property rights are those 'such as copyright, patent, trademark, trade name, trade secret, service mark or other designation of origin or authenticity.' Thus, by its terms, the list is

15

expressly nonexclusive. (Cf. *Shaddox v. Bertani* (2003) 110 Cal.App.4th 1406, 1414 [in statutory construction, ' "[t]he phrase 'such as' is not a phrase of strict limitation, but is a phrase of general similitude indicating that there are includable other matters of the same kind which are not specifically enumerated." [Citation.]'].) Moreover, to the extent Radcliffe is claiming use of her likeness constituted an endorsement, that too falls within the category of intellectual property claims listed in the exclusion, such as trademark. (See *Waits v. Frito-Lay, Inc.* (9th Cir. 1992) 978 F.2d 1093, 1110 [false endorsement claim based on the unauthorized use of a celebrity's identity alleges misuse of trademark].)" (*Aroa, supra,* 198 Cal.App.4th at pp. 788-789.)

*S.B.C.C., Inc. v. St. Paul Fire & Marine Ins. Co.* (2010) 186 Cal.App.4th 383 (*S.B.B.C.*) is also instructive. The issue there arose in a case where a former employee Foust took confidential information when he went to work for the insured, South Bay Construction Company (South Bay). South Bay was sued along with its employee and tendered defense to its insurer, St. Paul, which refused it. South Bay then sued St. Paul for breach of contract, bad faith, and declaratory relief. (*Id.* at pp. 386-387.) Both parties moved for summary judgment or summary adjudication. The trial court ruled for St. Paul, finding that, while there was a triable issue of fact as to whether the underlying lawsuit had alleged "advertising injury," there was no coverage because the policy excluded claims resulting from intellectual property infringement. (*Id.* at p. 387.) The Court of Appeal affirmed, concluding that the underlying lawsuit did not allege advertising injury. (*Id.* at pp. 392–393.) But the court went on to discuss the "intellectual property" exclusion, in the course of which it noted—and rejected—some of the very arguments the Estate makes here. Specifically:

"Although the trial court rejected St. Paul's effort to show no potential coverage for South Bay's conduct as an 'advertising injury offense,' it nonetheless found summary judgment appropriate based on the policy exclusion for claims of intellectual property infringement. Under this provision no coverage is afforded if the alleged injury results from misappropriation of trade secrets or violation of other intellectual property rights or laws. In attempting to avoid the application of this coverage limitation, South Bay

16

emphasizes that only one of SJC's claims was for trade secrets violation, and not all of the information taken from SJC was a 'work of the mind.' Because some of the material was client information and records, it 'cannot be excluded as intellectual property under St. Paul's definition because pure factual data cannot constitute a "work of the mind." '

"South Bay correctly points out that exclusions must be stated in clear and unmistakable language and are interpreted narrowly against the insurer. [Citations.] But even exclusionary language must be construed in the context of the policy as a whole, and in the circumstances of that case, and 'cannot be found to be ambiguous in the abstract.' [Citation.] Here the challenged exclusion is clear and explicit; it expressly states that in addition to the listed forms of intellectual property infringement, there is no coverage for 'any other injury or damage that's alleged in any claim or suit which also alleges any such infringement or violation.' [Citations.])

"In summary, we conclude that the CGL policy St. Paul issued to South Bay did not offer coverage against the types of claims brought by SJC. Although an insurer's duty to defend is broader than its duty to indemnify, ' "the insurer need not defend if the third party complaint can by *no conceivable theory raise a single issue which could bring it within the policy coverage*." ' [Citation.] Thus, 'where the extrinsic facts eliminate the potential for coverage, the insurer may decline to defend even when the bare allegations in the complaint suggest potential liability. [Citations.] This is because the duty to defend, although broad, is not unlimited; it is measured by the nature and kinds of risks covered by the policy.' [Citations.] Here St. Paul has demonstrated, 'by reference to undisputed facts, that the claim cannot be covered. [Citation.] Given the underlying facts and the policy language at issue, there is no theory on which SJC's action could conceivably be covered. We therefore agree with the superior court that St. Paul was entitled to summary judgment in South Bay's action against it." (*S.B.C.C., supra,*186 Cal.App.4th at pp. 396–398.)

A leading commentary describes the exclusion—which it calls the "intellectual property" or "IP" exclusion—this way: "[T]he IP exclusion may preclude coverage for all claims arising out of infringement of patent, trademark, trade secret, or other

intellectual property rights, regardless of whether the infringement occurs in an 'advertisement.' Therefore, unfair competition claims that arise solely from a policy holder's trademark infringement are precluded from coverage by the IP exclusion." (4 Thomas, New Appleman on Insurance Law Library Edition (2014) § 30.08[6][a], p. 30-136.4, fns. omitted.)

The Estate protests about calling the exclusion the "intellectual property" exclusion. But no court has had a problem with these words, uniformly referring to this exclusion—included, not incidentally, on a standard insurance industry form—as the "Intellectual Property" exclusion. *Aroa* used the term. So did *S.B.C.C.* So, too, the Ninth Circuit Court of Appeals. (See *Street Surfing, LLC v. Great Am. E&S Ins. Co.* (9th Cir. 2014) 776 F.3d 603, 606.). And the leading treatise. (Croskey, *supra*, § 7:1066.12, p. 7C-36.) Were all this not enough, throughout its opposition to Alterra's motion for judgment on the pleadings, the Estate referred to the exclusion as the "intellectual property exclusion".

The Estate's makes five subarguments here—arguments, we note, that are far broader than its position below, which argued only that the intellectual property exclusion must be construed against Alterra because it is "ambiguous and does not address Lanham Act/unfair competition claims." Those subarguments are: (1) *Aroa* failed to apply the holding that exclusions must be conspicuous, plain, and clear; (2) *Aroa* is distinguishable on its facts; (3) the specific exclusion in *Aroa* directly encompassed the right of publicity; (4) *Aroa* is an outlier; and (5) *Aroa* should not be applied retroactively.

To begin with, the "conspicuous, plain and clear" argument was apparently not even advanced in *Aroa*. Regardless, we have addressed the "plain and clear" argument above, and found it wanting.

As to "distinguishable on its facts," the Estate asserts that the exclusion there was different from the exclusion here. Whatever the variation in the wording, the exclusion there did not expressly state that it applied to invasion of privacy or right of publicity claims. But, as *Aroa* holds, such claims fall within its nonexclusive listing, which there included " 'any violation of any intellectual property rights.' " (*Aroa, supra,*

18

198 Cal.App.4th at p. 788.)  Similarly here.  (*Comedy III Productions, Inc. v. Gary Saderup, Inc., supra,* 25 Cal.4th at p. 391; *Aroa, supra,* 198 Cal.App.4th at pp. 787–788 [explaining that a "right of publicity" claim, defined as "appropriation, for the defendant's advantage, of the plaintiff's name or likeness," is one of four types of "right of privacy torts"]; see generally 5 Witkin, Summary Cal. Law (10th ed. 2005) Torts, § 676, pp. 993–994;.)

The Estate asserts that to apply the intellectual property exclusion must specify each type of excluded intellectual property claim.  But the Estate cites no authority supporting this proposition.  Again, *Aroa* is apt, where it relied on the phrase "any intellectual property rights, such as . . . ," virtually identical to the Alterra's policy's "or other intellectual property rights," to exclude invasion of privacy and right of publicity claims.  The use of "or" in the Alterra policy, like the words "such as" in *Aroa*, indicates there are "matters of the same kind which are not specifically enumerated." (*Id.* at p. 789.)  Or, as the court earlier put it, "The exclusion applies when the injury arises out of 'any violation of any intellectual property rights.'  Even if this language is interpreted narrowly against the insurer, it clearly applies to bar claims based on the right of publicity, as that right has been held to be an intellectual property right." (*Id.* at p. 788 ["the fact that the right of publicity is not specifically listed after the phrase 'any intellectual property rights' does not suggest the exclusion does not apply. . . . the list is expressly nonexclusive"].)

The Estate argues its right to publicity claims are not within "other intellectual property rights" by contrasting them with "copyrights, patents and trademarks," claims expressly listed in the intellectual property exclusion.  No court has ever made such a distinction, and again the Estate cites no supporting authority.  Its simplistic premise is that copyrights, patents and trademarks "may be registered with an agency of the federal government" which "gives third parties an opportunity to check public federal documents to see whether or not someone claims a protectable right to such property."  And, the argument runs, Fuller's name is not such a "creation," cannot be registered or "bought and sold."

19

Such argument is less than candid. The Estate's rights, which derive from the Estate's position as successor to the rights of Fuller, are in fact registered, at least according to the Estate's own allegations: "[i]n 1985, [the Estate] registered its claim as the successor-in-interest to the rights of Buckminster Fuller pursuant to Civil Code § 3344.1(f)." Indeed, not only registered, but also according to the Estate, it has "licensed those rights on many occasions. The licensees include Apple Computer, which used Bucky's image (along with those of John Lennon, Pablo Picasso, Albert Einstein, Mahatma Gandhi, Frank Lloyd Wright and others) in its 'Think Different' advertising campaign."

The Estate contends that *Aroa* is an "outlier," in claimed support of which the Estate cites two federal cases: *Santa's Best Craft, LLC v. St. Paul Fire & Marine Ins. Co.* (7th Cir. 2010) 611 F.3d 339; and *Dish Network Corp. v. Arch Specialty Ins. Co.* (10th Cir. 2011) 659 F.3d 1010. Neither is availing, not legally, not factually.

In *Santa's Best*, the insurer argued the "trade dress" portion of the exclusion applied to an underlying lawsuit despite factual allegations the insured had allegedly infringed on a slogan. The court held that the slogan allegations precluded application of the "trade dress" part of the exclusion. (*Santa's Best Craft, LLC v. St. Paul Fire & Marine Ins. Co., supra,* 611 F.3d at p. 348) The "other intellectual property rights or laws" language in the exclusion was never addressed.

In *Dish Network* the question was whether a patent infringement suit was covered under the "advertising injury" coverage of five different policies. The insured argued there was an ambiguity in four of the policies because the fifth expressly included "patent infringement" in its intellectual property exclusion. (*Dish Network Corp. v. Arch Specialty Ins. Co., supra,* 659 F.3d 1010 at p. 1019.) The Court of Appeals held that the complaint in the underlying action potentially alleged misappropriation of advertising ideas. But that is as far as it went, expressly noting that "several issues the district court did not address remain to be resolved," including one insurer's argument that its "intellectual property exclusion . . . bar[s] coverage." (*Id.* at p. 1028.) And the court observed, "The district court did not reach these arguments," and so the Court of Appeals

20

"express[es] no view as to the merits . . . ." (*Ibid*.) *Dish Network* is not authority regarding application of the intellectual property exclusion.

Finally, the Estate contends *Aroa* cannot pertain here because it was decided after Alterra issued its policy to Maxfield, and cannot be applied retroactively. The general rule is that appellate decisions in civil cases are almost always given retroactive application. (See, e.g., *Grafton Partners L.P. v. Superior Court* (2005) 36 Cal.4th 944, 967.) The rule is subject to narrow, rarely invoked exceptions based on considerations of fairness and public policy. (*Rose v. Hudson* (2007) 153 Cal.App.4th 641, 653.) We see no need to weigh in on any retroactive/prospective argument, for the significance of *Aroa* is, as we noted, its reasoning, which we find persuasive—and applicable here. Or, to put it otherwise, we would reach the conclusion we do even if *Aroa* had not been on the books.

## DISPOSITION

The judgment is affirmed.

_____
Richman, J.

We concur:


_____
Kline, P. J.


_____
Stewart, J.


A140453, *Alterra Excess and Surplus Ins. Co. v. Estate of Buckminster Fuller*

| | |
|---|---|
| Trial Court: | Superior Court, City and County of San Francisco |
| Trial Judge: | Honorable Leslie C. Nichols |
| Attorneys for Defendant and Appellant: | Law Offices of Thomas A. Cohen, Thomas A. Cohen |
| Attorney for Plaintiff and Respondent: | Gordon & Rees, Arthur Schwartz, Randall P. Berdan |