Filed 11/25/15  City of San Bernardino Municipal Water Dept. v. American Alternative Ins. Corp. CA4/1

## NOT TO BE PUBLISHED IN OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA

| | |
|---|---|
| CITY OF SAN BERNARDINO MUNICIPAL WATER DEPARTMENT,<br><br>Plaintiff and Appellant,<br><br>v.<br><br>AMERICAN ALTERNATIVE INSURANCE CORPORATION,<br><br>Defendant and Respondent. | D068482<br><br><br><br>(Super. Ct. No. RIC1202114) |

APPEAL from a judgment of the Superior Court of Riverside County, Richard J. Oberholzer and Edward D. Webster, Judges.  Judgment affirmed.  Appeal from denial of summary adjudication dismissed.

Radcliff & Saiki and Eric H. Saiki for Plaintiff and Appellant.

Wood, Smith, Henning & Berman, Kevin D. Smith, Stacey F. Blank, Nicholas M. Gedo and Keith E. Smith for Defendant and Respondent.

In 2004 the City of San Bernardino Municipal Water Department (City) purchased a blended insurance policy and investment product through an insurance broker, Alliant Insurance Services (Alliant). The insurance was designed to insure against City's liability, and also pay for environmental remediation caused by chemical pollution introduced into a local aquifer by a United States military base during World War II.

When the state assessed a $1.64 million tax on this insurance, a dispute arose between the City and Alliant over who was responsible to pay the tax. Ultimately, Alliant paid about $1.4 million of the tax. City sued Alliant for professional negligence, among other things, and Alliant cross-complained against City seeking reimbursement for the tax it paid.

City tendered defense of the cross-complaint to American Alternative Insurance Corporation (AAIC), which had issued City a liability policy. After AAIC denied coverage, City filed a motion for summary adjudication on the issue of duty to defend. About a month later, AAIC filed a motion for summary judgment, asserting there was no coverage as a matter of law. The trial court denied City's motion and granted AAIC's motion.

City contends the judgment should be reversed because: (1) having determined triable issues of fact precluded summary adjudication in favor of City, the trial court was required to deny AAIC's motion for summary judgment on the same grounds; (2) the trial court failed to determine whether AAIC owed a duty to defend in 2007, when Alliant filed its cross-complaint; (3) Alliant's cross-complaint alleged tort theories; which along

2

with "extrinsic evidence" established a potential for coverage and a duty to defend; (4) the alleged wrongful conduct "clearly occurred within the pertinent time period"; and (5) the "undisputed evidence" is City "had no reason to know at policy inception that Alliant would make a formal claim."

We affirm. The trial court correctly determined there was no potential coverage because Alliant's claims against City were exclusively for breach of contract, which AAIC's policy excludes. Because there was no possibility of coverage, and therefore no duty to defend on this ground, the trial court correctly entered judgment in favor of AAIC.

## FACTUAL AND PROCEDURAL BACKGROUND

A. *The AIG Blended Policy*

City owns property that had ground water contamination as a result of its use by the United States military during World War II. In ensuing litigation, City and the United States entered into a consent decree that contemplated City managing a 50-year remediation program using federal funds.

To fund the remediation program using the settlement proceeds, City consulted with Kennen Staley, an insurance broker who was employed by Alliant. Staley negotiated with American International Group, Inc. (AIG) for an insurance product consisting of (1) liability coverage for pollution causing bodily injury or property damage, and (2) an investment designed to generate sufficient returns to pay remediation costs for the first 30 years of City's remediation obligations.

3

The premium for the AIG policy was over $51 million. Of this amount, approximately $42.5 million was the premium for the investment or annuity portion, and approximately $8.9 million was the premium for the liability portion.

B. *Surplus Lines Tax Dispute*

California law imposes a 3 percent surplus lines premium tax plus other fees on policies issued by nonadmitted insurers, such as AIG. (Ins. Code, § 1775.5.) The $51 million premium did not include any such tax. A letter from AIG to Staley states "[i]t is the [b]roker's responsibility to access, collect, and remit these charges."

In 2004 Staley discussed this tax with the California Department of Insurance. From those informal and nonbinding discussions, Staley believed the state would assess tax on only the liability premium portion of the policy, resulting in a tax of approximately $225,000.

Several months later, however, Staley reported the Department of Insurance was inclined to change its position and tax the entire $51 million premium. The total tax due would be $1,660,589. In March or April 2005, with the tax issue still unsettled, City paid the $51 million premium.

In April 2005 the City's then-lawyer, Russell Randle write to Staley, telling him the City "[did] not have the cash to pay a $1,660,000 tax . . . . Randle told Staley the City wanted AIG to "meet us halfway on this problem."

AIG offered City a $600,000 reduction in premium, which City accepted. Stacey Aldstadt, the City's general manager, testified AIG reduced the City's premium by $600,000 because "AIG recognized that there was a problem and that we had been caught

4

unaware of that problem and that we were in a very difficult position." Thomas Jacobson, an attorney representing City at the time wrote, "AIG paid the Water Department $600,000 to be used to resolve the tax issue."[1]

With an enormous tax potentially looming, City looked for a political solution, first through the California Department of Justice and then with its state Assembly member. Meanwhile, in November 2005 Staley informed City the Department of Insurance had decided to imposes taxes and fees on the entire $51 million premium.

The next month, Jacobson wrote to Alliant's lawyer, Cheryl Orr, stating City paid $275,000, the tax on the premium attributable to the liability portion of policy. Jacobson said City would not pay any additional taxes and asserted Alliant was legally responsible for the remaining taxes and fees.

In January 2006 Alliant sent a $1,370,875.62 invoice to City for the "remaining tax obligation." Alliant's cover letter stated, "As you are aware it is the obligation of the insurance broker to assess, collect and remit these taxes to the State of California." Two weeks later, Alliant sent a $1,706,756.98 invoice to City, representing the tax, interest, and penalties the Department of Insurance assessed.

In February 2006 Jacobson wrote to the Department of Insurance, stating, "Though the tax . . . is imposed on the broker, we are requesting an opportunity to participate in discussions concerning this matter because Driver is claiming they may

---

1    In its reply brief, City states, "the contention [that City received a premium reduction to offset any tax liability] is a blatant misrepresentation," even though that is exactly what Jacobson wrote at the time.

have the right to seek indemnity or contribution from us if the tax is imposed in amounts in addition to those already paid."[2]

In June 2006 Orr wrote to Jacobson, stating Alliant was obligated to pay the tax or else face possible suspension or revocation of its broker's license. Orr's letter included a demand City pay the tax, now $1,538,577.51 plus interest at $419.25 per day. Orr's letter reminded City, "AIG agreed to refund $600,000 in premium to the Water Department for the purpose of applying those funds to any surplus lines tax liability that might eventually be assessed . . . ."

After settlement attempts failed, in October 2006 Orr wrote to Jacobson, stating Alliant "will be paying the tax and accrued interest" and would "undertake to protest the tax determination . . . and seek a refund." Orr threatened to sue City "to seek full recovery of the tax . . . ."

C. *Alliant's Government Claim*

In December 2006 Orr sent a "Notice of Claim Against Public Entity" addressed to the City of San Bernardino Water Department.[3] The notice of claim asserted in

---

[2] The parties refer to Alliant as Alliant, Driver-Alliant Insurance Services, or Driver. The parties do not advise us of any relevant distinction among these names for purposes of this case. For clarity, we use Alliant throughout this opinion.

[3] On June 21, 2007, Orr sent another notice of claim, this one addressed to the City of San Bernardino (instead of "Water Department"), repeating the substance of the December 2006 notice. The parties do not discuss the legal significance, if any, of two such notices.

6

October 2006 Alliant paid $1,377,251.77 "for tax liabilities incurred by the Water District but that the Water District failed and refused to pay."

D.  *City's Tender of Defense*

City's AAIC policy provides AAIC "shall have the right and duty to defend the Insured against any 'suit'" seeking specified damages.  Although no suit had yet been filed, in January 2007 Jacobson wrote to AAIC, forwarding a copy of Alliant's notice of claim, explaining the background of the AIG insurance and tax dispute, and "tendering" the claim "pursuant to the terms of the policy covering acts and omissions."

E.  *AAIC Denies Defense*

In February 2007 Glatfelter Claims Management, Inc. (Glatfelter), acting on AAIC's behalf, denied defense on the grounds the claim arose (1) from City's refusal to pay a tax, representing a "financial gain to which the City was not legally entitled," and therefore not a covered "wrongful act"; and (2) from the purchase of an insurance contract that allegedly created a contractual obligation upon the City to pay the tax, and there is a policy exclusion for failing to perform or breach of contract.

F.  *City Sues Alliant*

In June 2007 City sued Alliant and Staley for alleged breach of fiduciary duty, breach of contract, professional negligence, negligent misrepresentation, and declaratory relief.  City alleged as damages "fees it has been forced to pay, and continues to pay, to lobbyists, consultants, and attorneys in efforts to mitigate the putative additional costs that the City may owe on the investment contract portion of the AIG Agreement."

7

G. *Coverage Dispute Continues*

By July 2007 Jacobson no longer represented City in dealing with AAIC, City having retained new counsel, Radcliff & Saiki, LLP.

Jules Radcliff, Jr., sent a letter to Glatfelter to "alert[] you to the fact that additional information has been developed and will soon be provided to you."  Radcliff asserted he met with Alliant's attorneys and "have engaged in a more informed discussion of said counsel's theories of recovery and understanding of the facts supporting those theories."  He added, "your insured, by its conduct  . . . caused, or substantially contributed to, a series of events that resulted in significant miscommunication with various state governmental agencies, including the California Department of Insurance [and]  . . . through a further series of errors [led]  . . . to the improper leveling of a premium tax . . . ."  Radcliff ended the letter by promising, "*In the coming days we will provide you with additional information and details, together with supporting documentation wherever available*."  (Italics added.)

Despite promising to provide additional information "in the coming days," in fact Radcliff did not again communicate with Glatfelter until *seven months* later.  In February 2008 Radcliff wrote to Glatfelter, complaining "[w]e have heard nothing further from AAIC but silence."  He asserted, "For over one year this factually-complex claim has been ignored by you, no investigation at all has been conducted, and the interests of your insured have been abandoned."  Counsel stated Glatfelter's denial of coverage and defense was "squarely at odds with the facts underlying this claim."

8

Radcliff's February 8, 2008 letter contained no new factual information.  But there had been a significant event.  In November 2007 Alliant filed a cross-complaint against City.  The proof of service shows Alliant served Radcliff & Saiki, LLP, with the cross-complaint on November 2, 2007.

H.  *Alliant's Cross-Complaint*

Alliant's cross-complaint alleged four theories of liability against City:  (1) account stated; (2) open book account; (3) equitable indemnity; and (4) unjust enrichment.  Alliant's cross-complaint alleged "[i]t is the custom and standard practice in the insurance brokerage industry for the surplus lines broker . . . to bill the insured for the premium and all applicable taxes and fees . . . ."  Alliant also alleged AIG discounted the premium by $600,000 "to provide the City with additional funds" for paying the surplus lines tax.  Alliant alleged City agreed to pay the tax, Alliant sent City invoices for taxes due, and City refused to pay.

I.  *Continuing Dispute About Coverage*

In February 2008, still unaware that Alliant had filed a cross-complaint against City, Glatfelter responded to Radcliff's letter of February 8.  Glatfelter reminded counsel that in July 2007 he had promised to provide additional information "in the near future"; however, "[t]o date, I have not received the information discussed in the July 9, 2007 letter."

On March 17, 2008—more than four months since being served with Alliant's cross-complaint—Radcliff again wrote to Glatfelter stating, "[W]e have no idea what information you may actually need and find most relevant."  Radcliff stated there had

9

been "numerous developments that, presumably, would be of interest to you and to AAIC"—but he said nothing about Alliant's cross-complaint. Instead, Radcliff stated City was "shocked and dismayed by AAIC's initial denial of coverage" and "will hold AAIC and its agents responsible for this continuing abandonment in the face of a clearly covered claim." Radcliff added that he had spoken to Alliant's lawyer, who stated he intended to pursue a negligence claim against City. However, Radcliff did not enclose a copy of Alliant's cross-complaint, which contains no negligence allegations.[4]

On April 2, 2008, Radcliff wrote another letter to Glatfelter. The letter begins, "I wanted to give you a heads-up that after a period of relative inactivity the litigation part of this matter is about to heat up considerably . . . ." But still, Radcliff did not enclose Alliant's cross-complaint.

The next day, Glatfelter wrote Radcliff, requesting a copy of Alliant's cross-complaint, stating, "Your recent correspondence states a lawsuit has been filed against the Water Department. The Common Policy Conditions of the Special Districts Insurance Program Policy require an insured to immediately forward a copy of a suit for our review. To date, we have not received a copy . . . ."

On April 9, 2008—five months after Alliant served its cross-complaint—Radcliff sent Glatfelter the cross-complaint.

---

[4]     City's brief asserts, "Throughout the entire dispute between [City] and Alliant . . . [City's] counsel continually provided AAIC with facts and information concerning developments in the [u]nderlying [a]ction." The facts stated in the text do not support this assertion.

On May 5, 2008, Glatfelter denied coverage and defense on the grounds: (1) the conduct Alliant alleges is not a "wrongful act" as defined in the policy because the lawsuit sought restitution of financial gain to which the City was not legally entitled; (2) the policy excludes coverage for (i) failure to perform or breach of contract; and (ii) liability arising from Superfund obligations.

Radcliff replied to Glatfelter the next day, stating Alliant's attorneys "have informed me that they will try the case as a negligence action against your insured rather than simply as a tax reimbursement claim." The letter ended by stating, "Your handling of this claim is just unfathomable."

J. *Legislative Solution*

In early June 2008, Radcliff wrote to Glatfelter, stating, "We may soon have a determination that the financing component of the blended finite risk product that was utilized in this matter is not subject to taxation." He stated this was the basis of Alliant's "negligence" claim against the City. He ended by stating, "AAIC has acted in egregious bad faith in its handling of this claim to date."

In September 2008 the Legislature amended Insurance Code section 1775.5, subdivision (a) to exclude from taxation any portions of premiums for the investment portion of a blended finite risk product used in financing Superfund environmental settlements. As a result, the state refunded $1,377,251.77 tax Alliant had paid, plus interest. Alliant dismissed its cross-complaint against City.

11

K. *City's Complaint Against Alliant Goes to Trial*

Even with Alliant's cross-complaint dismissed, City continued to litigate its complaint against Alliant to recover its lobbying costs. Despite Radcliff's repeated assertions that Alliant intended to present a negligence case against City, Alliant never asserted City's purported negligence in any pleading in that litigation until literally the 11th hour—when Alliant filed a motion to amend its answer to assert a comparative fault affirmative defense a week before the case went to the jury, nearly two years after Alliant had dismissed its cross-complaint.

In July 2011 a jury returned a special verdict in City's favor against Alliant for professional negligence and negligent misrepresentation in the amount of $650,820.68. The jury found City was 25 percent negligent.[5]

After judgment, City and Alliant apparently settled the case. In connection with the settlement, they stipulated to vacate the judgment. On April 27, 2012, the trial court obliged and entered an order vacating the judgment.

L. *City Sues AAIC for Breach of Contract and Bad Faith*

In August 2012 City sued AAIC for breach of the insurance contract and bad faith. The complaint alleges AAIC "refused to provide the City with a defense" to Alliant's government claim and cross-complaint. City alleges AAIC breached the implied covenant of good faith and fair dealing by "denying the City a defense without proper

---

5      The parties do not inform us why City's cause of action against Alliant for breach of contract is not in the verdict form.

12

cause and without regard to the provisions of the policy, relevant case law, and the undisputed facts underlying the [government] claim and cross-complaint."

M. *City's Motion for Summary Adjudication*

City filed a motion for summary adjudication of the issue of AAIC's duty to defend. Stating, "Alliant sought from the outset" to assert "tort theories," City asserted there was a potential for coverage, triggering AAIC's duty to defend.

In its motion, City acknowledged that to obtain coverage (and defense), the AAIC policy requires the alleged "'wrongful act'" to have occurred either during the policy period, or before the policy so long as the insured "'neither knew nor could have reasonably foreseen that such 'wrongful act' might have been the basis of a claim or 'suit.'" City asserted there was "undisputed evidence" City "had no reason to know at policy inception that Alliant would make a formal claim." The cited "undisputed evidence" was a declaration by Stacey R. Aldstadt, City's general manager, a lawyer, who stated:

> "At the time of the policy's inception on June 30, 2006, I had no knowledge whatsoever that CSB [City] . . . had committed any act or omission that could become the basis of a claim or lawsuit against CSB. In particular, I had no knowledge that anyone at CSB, including its employees, attorneys, etc., had done or failed to do anything that would be the basis of a claim by Staley, Alliant . . . ."

N. *Alliant's Opposition to City's Motion for Summary Adjudication*

After City filed its motion, but before opposition was due, Alliant deposed Aldstadt. In deposition testimony, Aldstadt admitted that before the June 30, 2006 policy inception date, she knew Alliant was claiming City was responsible for paying the tax:

13

"Q: . . . Were you aware in February 2006 that Alliant was making the assertion that they would seek contribution from [City] for the surplus lines tax on the policy?

"A: . . . So yes . . . I would have been aware at that point that that may have been what Driver Alliant was alleging or claiming."

Aldstadt also admitted Alliant sent City invoices for the tax before the policy's inception date:

"Q: Isn't it true that prior to June 30th, 2006, you had received invoices from Alliant requesting that [City] pay the surplus lines tax?

"A: I think that's a true statement."

"Q: Isn't it true that as of June 30th, 2006, you were aware of the fact that Alliant was asserting [City] owed a surplus lines tax above and beyond that had already been paid? [¶] . . .

"A: . . . I am aware that Cheryl Orr had written a letter in early June 2006 asserting that [City] was responsible for paying. However, I did not believe that was to be—that was a true statement."

AAIC also deposed Jacobson. On June 14, 2006—two weeks before the AAIC policy inception—Jacobson wrote a letter to Orr, suggesting the parties and attorneys meet in an attempt to avoid litigation Jacobson testified:

"Q: As of June 14, 2006, when you wrote this letter . . . did you believe there was a potential for litigation between [City] and Alliant over the surplus lines tax?

"A: . . . I saw, given Miss Orr's conduct at that point in time, that if it was up to her, she would litigate first and discuss later.

"Q: And by this letter you wanted to meet to avoid potential litigation?

14

"A:  My client did.  Mr. Staley did.  Everybody wanted to besides Miss Orr."[6]

Opposing City's motion for summary adjudication, AAIC argued "[t]he heart of the dispute between [City] and Alliant  . . . arose out of [City's] failure to perform" its contractual obligation to pay the surplus lines tax.  Because the policy excludes coverage for "failure to perform or breach of contract," AAIC asserted there was no duty to defend. AAIC also argued there was no coverage because the undisputed evidence established City knew of the potential claim before policy inception, and failed to disclose the potential claim on the insurance application.

O.  *City's Reply on Its Motion for Summary Adjudication*

Given the deposition testimony showing City well knew of the potential claim before policy inception, City's reply argued AAIC's duty to defend cannot be decided "with the benefit of 20/20 hindsight" and instead must be based on what facts AAIC knew "as of February 21, 2007, when it disclaimed coverage . . . ."  City asserted, "Thus, whether today, in 2013, it can establish a lack of coverage does not negate the fact that a duty to defend existed in 2007 and thereafter . . . ."

P.  *The Court Denies Summary Adjudication*

The trial court (Judge Oberholzer) denied City's motion for summary adjudication on the grounds that "triable issues of material fact" existed, namely:  (1) "[w]hen the duty to defend arose"; (2) "[w]hether the exclusion for failure to perform a breach of contract

---

6    Ignoring this deposition testimony, City's brief asserts there was "undisputed evidence that  . . . [City] had no reason to know at policy inception that Alliant would make a formal claim against [City]."

15

applies"; (3) "[w]hether the City was obtaining improper financial gain"; and (4) "]w]hether wrongful acts occurred or took place during the policy period."

Q. *AAIC's Motion for Summary Judgment*

Meanwhile, in October 2013, AAIC filed a motion for summary judgment. AAIC's motion, and City's opposition, mostly repeated the same arguments made in the context of City's motion for summary adjudication. For example, AAIC argued there was no duty to defend because: (1) no "wrongful act" occurred within the policy period; (2) there is no coverage for a tax obligation; and (3) no coverage for breach of contract.

City opposed the motion, asserting: (a) the duty to defend is determined by information the carrier possessed when it refused to defend, and the carrier cannot justify a refusal to defend by hindsight; (b) AAIC's duty to defend was triggered by Alliant's government claim; (c) Alliant pursued tort theories; (d) the policy exclusion for breach of contract did not apply; and (e) the trial court's previous ruling denying City's motion for summary adjudication already established there were triable issues of fact precluding summary judgment.

R. *The Trial Court Grants Summary Judgment*

The trial court (Hon. Edward D. Webster) granted summary judgment. The court stated the "first and strongest argument" is City knew of Alliant's claim and failed to disclose it before purchasing the AAIC policy:

> "There were discussions going back, letters going back. There was a dispute already raging as to who's going to be responsible for the tax. In fact, at some point . . . the City got a $600,000 refund on the underlying policy. [¶] But again, clearly, the act and knowledge of the act occurred before June 30th, 2006. So, on the very terms of the

16

policy, any claims for coverage by the City for the attorney's fees in that litigation is not covered.  To me, that is clear as can be."

The trial court also granted summary judgment because AAIC's policy excludes coverage for breach of contract claims.  The court stated:

"I agree that the policy exclusion providing 'liability for damages arising out of failure to perform or breach of contractual obligation' applies.  [¶]  To my mind, the issue of who's going to pay the tax is not a tort.  It involves a dispute, either express or implied contract, who's going to be responsible for it.  I mean, there's even an agreement by [AIG] that they were going to give a $600,000 refund to the City, which it got, on a reduction of the premium, arguably to cover the tax.  So this is all related to agreements or understandings between the parties.  This is not a tort situation."

The trial court rejected City's argument that "extrinsic" evidence outside the cross-complaint's allegations created a duty to defend.  Addressing City's lawyer, the court stated:

"Even your very best argument for coverage, it seems to me, depends upon a remarkably slender thread of logic, and that is, because Alliant said in the letter it may have a claim for negligence where no one had a clue what they were talking about, and which was not reflected in the cross-complaint, that somehow that ephemeral statement in the letter is enough to give right to duty to defend.  That's your argument at best, what I heard, for whatever it's worth.  [¶]  So I will grant the motion on the grounds stated."

City timely filed a notice of appeal from the judgment.  City's notice of appeal also purports to appeal from "The Order Denying Plaintiff's Motion for Summary Adjudication of Issues entered on February 28, 2014."

17

DISCUSSION

## I. *THE STANDARD OF REVIEW*

"We review the trial court's grant of summary judgment under a de novo standard of review." (*Gonzalez v. Fire Ins. Exchange* (2015) 234 Cal.App.4th 1220, 1229.) "In reviewing a grant of summary judgment in favor of the defendant, as in this situation, we must review the entire record de novo and determine whether the defendant '"conclusively negated a necessary element of the plaintiff's case or demonstrated that under no hypothesis is there is a material issue of fact that requires the process of trial."'" (*Ibid*.) "'[T]he trial court's stated reasons for its rulings do not bind us. We review the ruling, not its rationale.'" (*Monticello Ins. Co. v. Essex Ins. Co.* (2008) 162 Cal.App.4th 1376, 1385.)

## II. *CITY'S APPEAL FROM THE ORDER DENYING SUMMARY ADJUDICATION IS DISMISSED*

The trial court denied City's motion for summary adjudication on the grounds "triable issues" existed. City contends this ruling *necessarily* requires AAIC's motion for summary judgment to also be denied. We disagree because City's argument ignores the applicable standard of review. As noted, we review the summary adjudication and summary judgment orders de novo. Moreover, we review the trial court's ruling, not the court's rationale. (*Kids' Universe v. In2Labs* (2002) 95 Cal.App.4th 870, 878.) Because in our de novo review we determine summary judgment for AAIC should be affirmed, then necessarily the order denying City's motion for summary adjudication was also

18

correct, regardless of whether the reasons (i.e., the existence of triable issues) given for that ruling were right or wrong.

Additionally, City's purported appeal from the order denying summary adjudication must be dismissed. An order denying summary adjudication is not separately appealable, but it may be reviewed on appeal from summary judgment. (*Cale v. Transamerica Title Insurance* (1990) 225 Cal.App.3d 422, 428, fn. 2.) However, because we affirm the summary judgment for AAIC, we have no occasion to consider the denial of City's motion for summary adjudication. The purported appeal from the nonappealable order denying summary adjudication must therefore dismissed.[7] (*Ibid.*)

### III. *THE DUTY TO DEFEND*

"A liability insurer owes its insured a broad duty to defend against claims creating a *potential* for indemnity. [Citations.] The duty to defend is broader than the duty to indemnify, and may exist even if there is doubt about coverage. [Citation.] When determining whether a duty to defend exists, the court looks to all of the facts available to the insurer at the time the insured tenders its claim for a defense. [Citation.] Initially, the court compares the allegations of the complaint with the terms of the policy. [Citation.] The proper focus is on the facts alleged in the complaint, rather than the

---

[7]     *Cale* also involved a denial of summary adjudication followed by a grant of summary judgment. The *Cale* court dismissed the purported appeal from the order denying summary adjudication, stating, "Since we affirm the summary judgment for Transamerica, we have no occasion to consider the denial of Cale's motion for summary adjudication. The purported appeal therefrom is dismissed." (*Cale v. Transamerica Title Insurance*, *supra,* 225 Cal.App.3d at p. 428, fn. 2.)

19

alleged theories for recovery.  Nevertheless, the insured "''may not speculate about unpled third party claims to manufacture coverage,'" . . . , and the insurer has no duty to defend where the potential for liability is "tenuous and farfetched." . . .  The ultimate question is whether the facts alleged "fairly apprise" the insurer that the suit is upon a covered claim.' [Citation.]  Facts extrinsic to the complaint may also be examined and may either establish or preclude the duty to defend.  [Citation.]  Any doubt as to whether the facts give rise to a duty to defend is resolved in favor of the insured."  (*Albert v. Mid-Century Ins. Co.* (2015) 236 Cal.App.4th 1281, 1289-1290.)  "'Since pleadings are easily amended, the proper focus is on the facts alleged, rather than the theories for recovery.'" (*Gonzalez v. Fire Ins. Exchange*, *supra,*  234 Cal.App.4th at p. 1230.)

The duty to defend is determined by facts known to the insurer at the time of the tender of defense.  (*Montrose Chemical Corp. v. Superior Court* (1993) 6 Cal.4th 287, 300.)  "The crucial question is whether [the insurer] was in possession of factual information which gave rise to potential liability under its policy when the company denied [the insured] a defense in [the underlying] action."  (*Mullen v. Glen Falls Ins. Co.* (1977) 73 Cal.App.3d 163, 170.)

Thus, where the insurer moves for summary judgment based on the lack of a duty to defend, the insurer must present undisputed facts establishing "the absence of any such potential" for coverage.  (*Montrose Chemical Corp. v. Superior Court*, supra, 6 Cal.4th at p. 300, italics omitted.)  In so doing, if coverage depends on an unresolved dispute over a factual question, the very existence of that dispute would not only result in the denial of

20

the motion, but also establish a possibility of coverage and thus a duty to defend. (*Horace Mann Ins. Co. v. Barbara B.* (1993) 4 Cal.4th 1076, 1085.)

"On the other hand, 'in an action wherein none of the claims is even potentially covered because it does not even possibly embrace any triggering harm of the specified sort within the policy period caused by an included occurrence, the insurer does not have a duty to defend. [Citation.] "This freedom is implied in the policy's language. It rests on the fact that the insurer has not been paid premiums by the insured for [such] a defense. . . . [T]he duty to defend is contractual. 'The insurer has not contracted to pay defense costs" for claims that are not even potentially covered." ' " (*Scottsdale Ins. Co. v. MV Transportation* (2005) 36 Cal.4th 643, 655.) "This includes claims falling outside the scope of the insuring clause, or within an express exclusion from coverage." (*Alterra Excess & Surplus Ins. Co. v. Snyder* (2015) 234 Cal.App.4th 1390, 1401.)

IV. *THE AAIC POLICY*

Effective June 30, 2006, AAIC issued liability insurance coverage to City, Policy No. SDISSK 9100525-3. The policy period is June 30, 2006 to June 30, 2007. Section I, "Insuring Agreement," part A provides in part:

> "We shall pay on behalf of the Insured those sums that the Insured becomes legally obligated to pay as damages because of . . . 'wrongful acts' . . . to which this Coverage Part applies. We shall have the right and duty to defend the Insured against any 'suit' seeking those damages, even if the allegations are groundless, false or fraudulent. However, we will have no duty to defend the Insured against any 'suit' seeking those damages to which this insurance does not apply."

21

Section I, part F, entitled "Wrongful Acts" provides in part:

> "This Coverage Part applies to 'wrongful acts' which take place during the policy period. Coverage is extended to include damages or injuries caused by 'wrongful acts' committed prior to the policy period . . . provided that: [¶] (1) At the inception of the policy period, the Insured against whom the claim is made neither knew nor could have reasonably foreseen that such 'wrongful act' might have been the basis of a claim or 'suit'; and [¶] (2) No other valid or collectible insurance applies to the 'wrongful act.'"

Section V, entitled "Exclusions," part M entitled "Failure to Perform or Breach of Contract" provides in part:

> "This Coverage Part does not apply to: [¶] . . . [¶] Liability for damages arising out of failure to perform or breach of a contractual obligation."

## V. *THE TRIAL COURT PROPERLY GRANTED SUMMARY JUDGMENT BECAUSE COVERAGE IS EXCLUDED FOR BREACH OF CONTRACT*

### A. *Any Duty To Defend Was Triggered by Alliant's Cross-Complaint, Not Its Government Claim*

At the outset, the parties dispute whether AAIC's duty to defend was potentially triggered by Alliant's government claim or instead Alliant's cross-complaint. The insuring agreement provides the duty to defend is triggered by "*suit*." Section VI, "Definitions," defines "suit" as follows:

> "'Suit' means a civil proceeding in which damages are alleged because of . . . wrongful acts . . . to which this insurance applies."

A government claim is a statutory prerequisite to certain suits, but it is not a suit. "The primary attribute of a 'suit,' as that term is *commonly* understood, is that parties to an action are involved in actual court proceedings initiated by the filing of a complaint." (*Foster-Gardner, Inc. v. National Union Fire Ins. Co.* (1998) 18 Cal.4th 857, 878.)

22

"'While a claim may ultimately ripen into a suit, "claim" and "suit" are not synonymous.'" (*Id.* at p. 879.) "Thus, a reasonable construction of the word "suit" is a lawsuit." (*Ibid.*)

The policy also defines "suit" to include:

> "An arbitration proceeding . . . . or [¶] [a]ny other alternative dispute resolution proceeding in which such damages are claimed and to which an Insured submits with our consent."

City contends its government claim is a "suit" under this alternative definition because the purpose of the claims filing requirement is to afford the government an opportunity to settle claims early, and thus constitutes an "alternative dispute resolution proceeding in which such damages are claimed." City's argument fails for two reasons. A government claim is not an "alternative dispute resolution proceeding." It is not an "alternative" to anything. Moreover, City's argument ignores the second clause of the definition. The "alternative dispute resolution proceeding" must be one "to which an insured submits with our consent." The government claims process did not involve City submitting to a proceeding, nor was the claim filed with AAIC's consent.

B. *Alliant's Cross-Complaint Solely Alleges Contractual Theories of Liability*

"The determination whether the insurer owes a duty to defend usually is made in the first instance by comparing the allegations of the complaint with the terms of the policy." (*Horace Mann Ins. Co. v. Barbara B., supra,* 4 Cal.4th at p. 1081.) As explained next, the allegations in Alliant's cross-complaint sound exclusively in contract, not tort.

23

1. *Common allegations*

Alliant's cross-complaint alleges the following "allegations common to all causes of action":

> "16.  It is the custom and standard practice in the insurance brokerage industry for the surplus lines broker . . . to bill the insured for the premium and all applicable taxes and fees, including any surplus lines taxes . . . ."
>
> "17.  The parties negotiating the AIG Policy, fully contemplated that a surplus lines tax might be imposed . . . ."
>
> "19.   . . . [R]epresentatives of the City, including its Water Department, Alliant, and AIG met in New York in 2004 to discuss the premium payment for the AIG Policy and the surplus lines tax problem.  At that meeting, AIG agreed to discount the premium on the AIG Policy by $600,000.  The intent of the discount was to provide the City with additional funds in the event that the DOI [Department of Insurance] did not agree that the [policy's investment portion] was not subject to the surplus lines tax."
>
> "32.  In December, 2005, Alliant sent the City a second invoice, invoicing the surplus lines tax . . . . [¶] 33.  The City failed and refused to pay the invoice within thirty days."
>
> "35.   . . . Alliant sent another invoice to the City for the outstanding tax . . . .  The City did not pay the January 27, 2006 invoice."
>
> "37.  On or about February 7, 2006, Alliant sent a letter to the City requesting payment of the outstanding surplus lines tax fees and interest.  The City, again, refused to make the payment."
>
> "41.  On or about June 6, 2006, Alliant requested the City to forward $1,442,935.02, the amount due . . . as of May 30, 2006 . . . .  [¶] 42. The City refused to and failed to remit payment . . . ."

Based on these allegations, Alliant alleged four causes of action:  (1) account stated, (2) open book account, (3) equitable indemnity, and (4) unjust enrichment.

24

## 2. *Account stated is a contractual theory of liability*

The first cause of action for account stated alleges, "On or about April 25, 2005 . . . an account was stated between Alliant and the City. . . . [¶] . . . At the time of the statement of the account, the City agreed to pay the amount of the surplus lines tax . . . ."

Account stated is a contractual theory of liability. "An account stated is an agreement, based on prior transactions between the parties, that the items of an account are true and that the balance struck is due and owing. [Citation.] To be an account stated, 'it must appear that at the time of the statement an indebtedness from one party to the other existed, that a balance was then struck and agreed to be the correct sum owing from the debtor to the creditor, and that the debtor expressly or impliedly promised to pay to the creditor the amount thus determined to be owing.' [Citation.] The agreement necessary to establish an account stated need not be express and is frequently implied from the circumstances. When a statement is rendered to a debtor and no reply is made in a reasonable time, the law implies an agreement that the account is correct as rendered." (*Maggio, Inc. v. Neal* (1987) 196 Cal.App.3d 745, 752-753.)

## 3. *Open book account is a contractual theory of liability*

"The term 'book account' means a detailed statement which constitutes the principal record of one or more transactions between a debtor and a creditor arising out of a contract or some fiduciary relation, and shows the debits and credits in connection therewith, and against whom and in favor of whom entries are made, is entered in the regular course of business as conducted by such creditor or fiduciary, and is kept in a

25

reasonably permanent form and manner and is (1) in a bound book, or (2) on a sheet or sheets fastened in a book or to backing but detachable therefrom, or (3) on a card or cards of a permanent character, or is kept in any other reasonably permanent form and manner."  (Code Civ. Proc., § 337a.)

Here, Alliant's cross-complaint alleges City "agreed to pay the amount of the surplus lines tax"  The alleged liability is one between debtor and creditor and is contractual.

4. *Alliant's cause of action for equitable indemnity is for implied contractual indemnity*

Alliant's third cause of action, entitled equitable indemnity, alleges Alliant paid taxes and fees "due to the refusal of the City to pay those amounts, which in equity and good conscience and under the law, are amounts payable by the City, not its insurance broker, Alliant."

City contends equitable indemnity is necessarily "tort-based" and therefore this cause of action precluded the trial court from entering summary judgment based on the breach of contract exclusion.

To begin with, "coverage turns not on 'the technical legal cause of action pleaded by the third party' but on the 'facts alleged in the underlying complaint' or otherwise known to the insurer." (*Gonzalez v. Fire Ins. Exchange*, *supra*, 234 Cal.App.4th at p. 1235, italics omitted.)  Therefore, even if equitable indemnity did always involve tort liability, the label "equitable indemnity" is not controlling.  The facts alleged are controlling.

26

Moreover, equitable indemnity is not exclusively a tort-based theory of liability. To the contrary, the theory includes implied *contractual* indemnity.

In general, indemnity refers to "the obligation resting on one party to make good a loss or damage another party has incurred." (*Rossmoor Sanitation, Inc. v. Pylon, Inc.* (1975) 13 Cal.3d 622, 628.) "Historically, the obligation of indemnity took three forms: (1) indemnity expressly provided for by contract (express indemnity); (2) indemnity implied from a contract not specifically mentioning indemnity (implied contractual indemnity); and (3) indemnity arising from the equities of particular circumstances (traditional equitable indemnity). (*Prince v. Pacific Gas & Electric Co.* (2009) 45 Cal.4th 1151, 1157 (*Prince*).)

"Although the foregoing categories of indemnity were once regarded as distinct, we now recognize there are only two basic types of indemnity: express indemnity and equitable indemnity." (*Prince*, *supra*, 45 Cal.4th at p. 1157.) *"[I]implied contractual indemnity is but a form of equitable indemnity*." (*Id*. at p. 1157, fn. 2, italics added.)

"'The right to implied contractual indemnity is predicated [on] the indemnitor's breach of contract.'" (*Sehulster Tunnels/Pre-Con v. Traylor Brothers, Inc./Obayashi Corp*. (2003) 111 Cal.App.4th 1328, 1350.) "'Implied contractual indemnity is applied to contract parties and is designed to apportion loss among contract parties based on the concept that one who enters a contract agrees to perform the work carefully and to discharge foreseeable damages resulting from that breach.'" (*Ibid*.) "An implied contractual indemnity action does not amount to a claim for contribution from a joint tortfeasor because it is founded neither in tort nor on any duty that the indemnitor owes to

27

the injured party. Rather, it is predicated on the indemnitor's breach of duty owing to the indemnitee to properly perform its contractual responsibilities." (*Id.* at p. 1351.)

In this case, the allegations in Alliant's third cause of action for "equitable indemnity" invoke principles of implied contractual indemnity. For example, paragraph 16 alleges the "custom and standard practice" to bill the insured for the tax. Paragraph 19 alleges City's acceptance of a $600,000 premium discount to offset the tax. Paragraph 65 alleges the City's legal obligation to pay the tax, and paragraph 67 alleges Alliant paid the tax "to avoid further interest and penalties." Paragraph 68 alleges Alliant seeks "equitable indemnity" for amounts "which in equity and good conscience and under the law, are amounts payable by the City . . . ."

5. *Unjust enrichment*

Alliant's fourth cause of action, entitled "unjust enrichment," sought restitution of the $600,000 premium reduction. Alliant alleged it was entitled to restitution because the money was intended to be used for paying the surplus lines tax on the investment portion of the policy, but instead, City retained the money. However, "'[t]here is no cause of action in California for unjust enrichment.' [Citations.] Unjust enrichment is synonymous with restitution." (*Durell v. Sharp Healthcare* (2010) 183 Cal.App.4th 1350, 1370.) The facts alleged, as already discussed, sound in contract.

C. *The Trial Court Correctly Determined There Was No Duty To Defend*

The trial court granted summary judgment on several alternative grounds, one of which is "[t]here is no coverage or duty to defend under the subject insurance policy for the failure to perform or breach of contract."

28

The trial court correctly determined AAIC owed no duty to defend from the first tender of suit.  The AAIC policy specifically excludes coverage for "Liability for damages arising out of failure to perform or breach of a contractual obligation." Glatfelter consistently cited this exclusion as a basis for denying coverage and defense from tender (of the government claim) through conclusion.[8]  As explained *ante*, Alliant's cross-complaint alleged City's liability on exclusively contractual grounds.  Based on the allegations of the cross-complaint, there was simply no potential for coverage for City's alleged breach of an agreement to pay the taxes.  "'The insurer's duty to defend does not extend to claims for which there is no potential for liability coverage.  This includes claims . . . within an express exclusion from coverage.'"  (*Alterra Excess & Surplus Ins. Co. v. Snyder, supra,* 234 Cal.App.4th at p. 1401, italics omitted.)

In its reply brief, City contends AAIC is relying on the breach of contract exclusion "for the first time on appeal" and should not be allowed to change theories.

City misreads the record.  AAIC relied on the breach of contract exclusion in opposing City's motion for summary adjudication and argued the issue in its memorandum of points and authorities.  AAIC also relied on the same exclusion in its motion for summary judgment.

---

[8]    City contends the trial court decided there was no duty to defend based on facts existing in 2014, but failed to decide the duty to defend issue based on facts existing at the time of tender.  City's argument fails because Glatfelter's initial denial of coverage in February 2007 cited the policy exclusion for breach of contract and the trial court relied on the same policy exclusion in granting summary judgment.

City also contends the exclusion for claims arising from breach of contract cannot apply because Insurance Code section 1775.5 imposes a duty only on the surplus lines broker to pay the tax, not the policyholder. However, City's argument misunderstands the relevant standard, which involves initially a comparison between the allegations in the complaint and the terms of the insurance policy. (*Albert v. Mid-Century Ins. Co.*, *supra,* 236 Cal.App.4th at pp. 1289-1290.) Alliant's cross-complaint alleged City agreed to pay the tax and breached that agreement. Paragraph 16 alleged an implied agreement in accordance with the "custom and standard practice in the insurance brokerage industry." Paragraph 19 alleged an oral agreement in consideration of a $600,000 premium reduction. Paragraph 54 alleged "City agreed to pay the amount of the surplus lines tax." The alleged conduct falls squarely within the policy exclusion for breach of contract.

Next, City contends there is additional evidence, outside the four corners of Alliant's cross-complaint, that was available to AAIC and creates a potential of coverage. City argues "the trial court erred in granting AAIC summary judgment when it never decided the key issue in the case, i.e., the duty to defend on the basis of any potential liability arising from facts available to the insurer from the complaint or other sources available to it at the time of the tender of defense."

The extrinsic evidence City relies on mostly consists of its attorney's letters to AAIC. Radcliff repeatedly told AAIC that based on conversations with Alliant's attorneys, Alliant would present a negligence theory against the City. For example, on May 6, 2008, Radcliff wrote that Alliant's attorneys "have informed me that they will try

the case as a negligence action against your insured rather than simply as a tax reimbursement claim."  In another letter, Radcliff wrote "it is the claimant's assertion that it was through the negligence and errors of your insured" that the state assessed tax on the investment portion of the AIG policy.

In addition to these letters, City notes in July 2011 the jury in City's case against Alliant assessed City with 25 percent comparative fault—demonstrating Radcliff was right:  Alliant was intending to, and would, successful make negligence claims against the City.

We reject City's argument about the comparative fault finding for two reasons. First, the time span is too attenuated to draw any relevant conclusions.  Alliant did not even amend its answer to assert comparative fault until just eight days before the jury returned its verdict in that case, and nearly four years *after* Alliant filed its cross-complaint against City.  Second, the comparative fault finding does not even actually exist anymore.  Based on City's stipulation, the trial court vacated the City's judgment against Alliant.

More importantly, City's argument about the information contained in Radcliff's letters to Glatfelter is based on a misunderstanding of law.  In *Gunderson v. Fire Ins. Exchange* (1995) 37 Cal.App.4th 1106, the court held "[a]n insured may not trigger the duty to defend by speculating about extraneous 'facts' regarding potential liability or ways in which the third party claimant might amend its complaint at some future date."  (*Id.* at p. 1114.)

31

Similarly, in *Hurley Construction Co. v. State Farm Fire & Casualty Co.* (1992) 10 Cal.App.4th 533, where the insured's counsel sent several letters to the insurer setting forth counsel's belief as to how the underlying action could potentially assert covered claims, the court rejected the argument that these "self-serving letters" to the insurer "bridged the coverage gap." (*Id.* at p. 540.)  As the court explained, "[T]he insured may not speculate about unpled third party claims to manufacture coverage." (*Id.* at p. 538; see *Baroco West, Inc. v. Scottsdale Ins. Co.* (2003) 110 Cal.App.4th 96, 104 [finding that even if insured's assertions in its tender letter of various factual situations that could create a potential for coverage were "within the realm of possibility," the insured's argument was still "nothing more than speculation" and did not trigger the duty to defend].)  "[W]hile the universe of facts bearing on whether a claim is potentially covered includes extrinsic facts known to the insurer at the inception of the suit as well as the facts in the complaint, it does not include *made up* facts, just because those facts might naturally be supposed to exist along with the known facts.  An insured is not entitled to a defense just because one can imagine some additional facts which would create the potential for coverage. . . .  [¶] . . .  [¶] . . . You don't prove an insurer has a duty to defend merely by making a good argument for potential coverage, you show it by demonstrating a potential for coverage under the terms of the actual policy." (*Friedman Prof. Management Co., Inc. v. Norcal Mutual Ins. Co.* (2004) 120 Cal.App.4th 17, 34-36.)

City asserts Radcliff was not speculating about amendments to Alliant's cross-complaint and was not making anything up; rather, he was providing "facts and information" by "concerning developments in the underlying action."

The record shows otherwise. Radcliff merely characterized Alliant's claims as involving unspecified "actions and inactions" by City that "caused . . . a series of events . . . [and] a further series of errors and miscommunications, leading to the improper leveling of a premium tax." Counsel stated, "[I]t is the claimant's assertion that it was through the negligence and errors of your insured" that the tax was assessed— although Radcliff promised to provide "additional information and details"— he never did.

There were neither *evidence nor facts* to support Radcliff's assertions about City negligence. City never provided AAIC with facts that, if true, would establish a potential for coverage; rather, City provided their counsel's uncorroborated analysis of the third party's claims. An insured's counsel's self-serving legal opinion about potentially covered claims "hardly constitutes a 'fact' known to [the insurer] which . . . gives rise to a . . . duty to defend." (*National Union Fire Ins. Co. v. Siliconix, Inc.* (N.D.Cal. 1989) 726 F.Supp. 264, 272.)

There is nothing in City's tender of the suit that even hinted at a potentially covered claim. And nothing AAIC received later altered that initial view. Having determined the trial court properly granted summary judgment on this ground, we need not consider any of the remaining grounds asserted by AAIC or City's responses.

33

DISPOSITION

The judgment is affirmed.  The appeal from the denial of summary adjudication is dismissed.  AAIC shall recover its costs on appeal.


NARES, J.

WE CONCUR:


HUFFMAN, Acting P. J.


McDONALD, J.